[S. F. No. 9545. In Bank.—October 16, 1920.]

JAMES W. CROWE et al., Appellants, v. THOMAS F. BOYLE, as Auditor, etc., et al., Respondents.

[1] MUNICIPAL CORPORATIONS — ILLEGAL CONTRACT — EXPENDITURE OF PUBLIC MONEY — INJUNCTION — RIGHT OF TAXPAYERS.—Taxpayers of a municipality have the right to enjoin the payment of money under an illegal contract between the municipality and a private corporation, although the injunction may result in the abandonment of the project contemplated by the contract and consequent business losses.

---

1. Right of taxpayer in absence of statute to enjoin unlawful expenditures by municipality, note, 36 L. R. A. (N. S.) 1.

[2] ID.—INTERPRETATION OF CHARTER—HISTORY OF ADOPTION.—In determining the intent of the people in adopting provisions of a city charter, the history of the adoption may be considered.

[3] ID.—ENTIRE LANGUAGE TO BE GIVEN EFFECT.—It is a fundamental rule of construction that effect should be given to all the language of a charter, constitution, or statute.

[4] ID.—CITY AND COUNTY OF SAN FRANCISCO — CONSTRUCTION OF PUBLIC UTILITIES — REGULATION OF METHOD OF ENTERING INTO CONTRACTS—POWER OF SUPERVISORS—CHARTER.—Under article VI, chapter 1, section 9 of the charter of the city and county of San Francisco, the supervisors are authorized by ordinance to regulate the method of entering into contracts for the work described in subdivision 8 of section 9, namely, the construction of public utilities, notwithstanding the general scheme for entering into contracts for public work contained in section 14 of the same article.

[5] ID.—CONTRACT FOR CONSTRUCTION OF AQUEDUCT—COST-PLUS-A-FEE PLAN WITH GUARANTEE — CONSTRUCTION OF ORDINANCE.—The board of supervisors of the city and county of San Francisco had the authority to enact an ordinance authorizing the board of public works to enter into a contract for the construction of an aqueduct in furtherance of the Hetch Hetchy project (the bringing of water from the Tuolumne River to the city) on a cost-plus-a-fee plan with a guarantee by the contractor that the total cost to the city should not exceed a specified maximum price per unit, and the phrase "cost-plus-a-fee" disassociated from the other parts of the ordinance and construed solely with reference to its language, and not with reference to any technical significance attached to the term, would seem clearly to indicate that the city was to pay the cost of doing the work, that is, for labor and material, and other expenses of the contractor, and to pay the contractor a fee for his services.

[6] ID.—GUARANTEE OF MAXIMUM UNIT COST BY CONTRACTOR—CONSTRUCTION OF ORDINANCE.—Where the board of supervisors of the city and county of San Francisco in an ordinance authorizing the board of public works to enter into a contract for the construction of an aqueduct on the cost-plus-a-fee plan with a guarantee by the contractor that the total cost to the city should not exceed a specified maximum price per unit, waived a bond to protect laborers and materialmen, provided for advance payments of actual cost, fixed no amount of bond for the faithful performance of the contract, and made no provision for the payment of labor and material after the maximum guaranteed cost had been exceeded, except for payment direct by the city, such facts led to the conclusion that it was the intention of the board that in any event the city should pay the actual cost and that the contract price should be such "cost-plus-a-fee."

[7] ID.—CONTRACTOR'S BOND—COMPLIANCE WITH CHARTER REQUIRE-
MENTS.—Where a contract between the city and county of San
Francisco and a construction company for the construction of an
aqueduct merely required that the guarantee of the contractor's
bond should be the amount of the unpaid fee in the hands of
the owner, a bond expressly providing that it was not intended
as a guarantee of the estimated maximum cost substantially com-
plies with the requirements of a bond for the faithful perform-
ance of the contract under section 21, chapter 1, article VI of
the charter.

[8] ID.—REQUIREMENT OF SINGLE SURETY ON BOND—POWER OF SU-
PERVISORS.—Assuming that the provision with reference to the
method of procedure in letting a contract for the construction of
a public utility contained in an ordinance enacted by the board
of supervisors of the city and county of San Francisco required
that the bond for the performance of the contract be signed by
two sureties instead of one, the supervisors had the power to
provide in the ordinance for only one surety, as is provided by
section 955 of the Political Code in case of corporate sureties,
and also had power after execution of the contract to waive
the requirement of more than one surety.

[9] ID.—RATIFICATION OF EXECUTION OF BOND BY SINGLE SURETY—
POWER OF SUPERVISORS.—The board of supervisors of the city and
county of San Francisco has the power to authorize by way of
ratification the execution of a contractor's bond for the con-
struction of a public utility by a single surety.

[10] ID.—FORM OF LEGISLATIVE ACT—RESOLUTION OR ORDINANCE.—In
the absence of statutory or charter provision to the contrary, a
legislative act may be either in the form of a resolution or of an
ordinance.

[11] ID.—RATIFICATION OF LETTING OF CONTRACT—RESOLUTIONS OF
SUPERVISORS APPROPRIATING MONEY.—Proceedings of the board
of public works of the city and county of San Francisco in the
letting of a contract and the taking of a bond relating to the
construction of an aqueduct were ratified by the subsequent reso-
lutions of the board of supervisors appropriating money for the
purpose of carrying out the contract, and were equivalent to or-
dinances, if they did not in fact become ordinances by reason of
approval by the mayor.

[12] ID.—INFORMALITY OF BOND — PREVENTION OF CONTRACT PAY-
MENTS—TAXPAYER WITHOUT AUTHORITY.—A taxpayer of a muni-
cipality cannot maintain an action to enjoin payments under a
contract for the construction of a public utility based solely
upon the mere informality of the contractor's bond in being
executed by one surety instead of two, as required by the char-
ter, where no showing is made or suggested of injury either to
the public or the taxpayer.

[13] ID.—SALE OF BONDS—INDORSEMENT BY AUDITOR ON CONTRACT—
     COMPLIANCE WITH CHARTER REQUIREMENTS.—In this action by
     taxpayers to enjoin the auditor of the city and county of San
     Francisco from paying money due under a contract for the con-
     struction of an aqueduct, the supervisors held to have regularly
     followed the authority vested in them with reference to the sale
     of bonds and the auditor to have complied with the requirements
     of the charter essential to the validity of the contract.

[14] ID.—PURCHASE OF BONDS — RIGHT OF CONTRACTOR.—It is not
     illegal for a contractor under a cost-plus-a-fee contract with a
     municipality to use part of his fee in the purchase of bonds sold
     to pay for the work, in the absence of fraud or collusion.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. Frank J. Murasky, Judge. Affirmed.

The facts are stated in the opinion of the court.

Jared How and Richard C. Harrison for Appellants.

George Lull, City Attorney, Robert M. Searls, Lent & Humphrey and Edward I. Wolfe for Respondents.

WILBUR, J.—This is an action brought by taxpayers to enjoin the defendant auditor from paying two hundred and seventy-six thousand dollars, due under a contract between the city and county of San Francisco, which will hereafter be referred to as "the city," and the Construction Company of North America, for the construction of about sixteen miles of aqueduct on what is known as the mountain division of the Hetch Hetchy project. The plaintiffs allege that the contract is void. The trial court, upon stipulated facts, denied the injunction and plaintiffs appeal. It is conceded by appellants that the contract was let in accordance with the ordinance of the board of supervisors, enacted for the purpose of regulating that matter, except in certain particulars, which will be hereafter noted. Appellants contend that the procedure prescribed by such ordinance is in violation of the charter. It is admitted by the respondents that if the charter provisions regulating the letting of contracts for public work by the board of public works (art. VI, sec. 14 et seq.) apply to the contract in question, the contract is unauthorized and void. The contract is of the type

known as "cost-plus-a-fee contract," that is, a contract by which the city pays for all labor and material used in the prosecution of the work, and, in addition, pays the contractor a fee for its services in superintending and managing the same. The contract was let after advertisement for bids. The fee of the Construction Company of North America under the contract is $1,190,329.20, and the aggregate cost of the work to the city, including the contractor's fee, is estimated and guaranteed at $7,802,952.80. Respondents contend that the method selected by the city authorities is the only possible one for getting the work done at a reasonable cost because of the uncertain and fluctuating cost of labor and material. In support of this contention they point out that the lowest flat contract bid made in response to the call for bids on that basis contained in the same notice calling for bids on the cost-plus-a-fee basis was $9,674,208, and the only other bid on that basis was $16,250,263. It is also stated that the issuance of an injunction against the respondents in this case would necessarily result in the stopping of the work now in progress, and that the delay in the Hetch Hetchy project incident to the disbandment of forces, which will be necessary in the event this case is decided in favor of the plaintiffs, will mean a loss to the city of at least two million dollars. [1] But, if we assume that the contract is illegal, calling, as it does, for an expenditure of nearly eight million dollars, the taxpayers have a right to prevent such illegal expenditure, which, in the legal sense, constitutes a loss to the city, although the injunction might result in the abandonment of the whole Hetch Hetchy project and the consequent business losses involved. The business exigencies which confront the city cannot justify the illegal expenditure of public money, even though such expenditure might result in a great profit to the city. We must, therefore, confine our investigation to the question of the legality of the contract.

The contract departs from the charter plan. It provides for the payment at the beginning of each year of a large installment of the fee, the first payment of which is the amount involved in this case. The charter provision in regard to installment payments during the progress of the work requires that no more than seventy-five per cent of the value of the labor done and materials furnished and used

shall be paid for as the work progresses. (Art. VI, c. 1, sec. 21.) It follows that if these charter provisions apply to this contract it is illegal and void. That question will now be considered.

Does the charter authorize the supervisors to adopt the cost-plus-fee plan?

A bond issue of forty-five million dollars was voted by the people of San Francisco in January, 1910, for the construction of the Hetch Hetchy project for the bringing of water from the Tuolumne River to the city. At the time the bonds were voted the charter authorized the city to acquire, construct, or complete public utilities from funds derived from the sale of bonds issued for that purpose. (Art. XII, secs. 1, 10, 14, 15.) These powers were to be exercised by the board of supervisors, but by an amendment to the charter, adopted by the people of San Francisco, November 5, 1918 (art. VI. c. 1, sec. 9, subd. 8), approved by the legislature January 17, 1919 (Stats. 1919, p. 1390), it was provided that the construction of all public utilities should be in charge of the board of public works of the city. Respondents claim that the full authority of the board of public works to contract for the construction of public utilities is controlled only by the ordinance of the supervisors enacted for that purpose. On the other hand, the appellants claim that section 14 of the same chapter (c. 1 of art. VI) with reference to the performance of all public work must control the action of both the supervisors and the board of public works, and that the provisions of section 14 and succeeding sections concerning the method of contracting are the measure of the power of both; that such charter provisions having been disregarded the contract is void, as is expressly provided in section 16: "Any contract made in violation of any of the foregoing provisions, and in the case of improvement of streets any assessment for the work done under such contract, shall be absolutely void."

We will now consider the provisions of the charter involved in the determination of the question in issue, contained in sections 9 and 14 et seq., of article VI, chapter 1, so far as material to the inquiry. Section 9, *supra,* provides: "The board of public works shall have charge, superintendence and control, under such ordinances as may from time to time be adopted by the board of supervisors . . .

8. Of the construction, maintenance and operation of any and all public utilities, owned, controlled or operated by the city and county, or which may hereafter be so constructed, owned, controlled or operated. Full authority is vested in the board of public works to carry out the powers granted in this paragraph, *and it may in accordance with such ordinances as the supervisors may enact, contract for work to be performed,* or materials or equipment to be furnished, or for expert, technical or professional services to be rendered, wherever such work, services, materials or equipment are certified by the city engineer to be necessary in connection with the construction, maintenance or operation of such utilities.'' (Italics ours.) Section 14 provides: "All public work authorized by the supervisors to be done under the supervision of the board of public works shall, unless otherwise determined by the board of public works, be done under written contract, except in case of urgent necessity hereinafter provided; *and except as otherwise specifically provided in this charter, the following proceedings shall be taken in all cases* in the matter of letting of contracts by said board. Before the award of any contract for doing any work authorized by this article, the board shall cause notice to be posted conspicuously in its office for not less than five days, and published for the same time, inviting sealed proposals for the work contemplated; except, however, that when any repairs or improvement, not exceeding an estimated cost of five hundred dollars, shall be deemed of urgent necessity by the board, such repairs or improvement may be made by the board under written contract or otherwise, without advertising for sealed proposals.'' (Italics ours.) Section 14 was in the charter when originally adopted. At that time the charter did not authorize the construction of public utilities by the city. That authority has subsequently been conferred by amendment. The respondents contend that, although the phrase ''public work'' as used in section 14 is broad enough to cover all work controlled by the board of public works, whether done by the city in its proprietary or in its governmental capacity, the words should, in the light of the legislative history, be held to apply only to work done by the city in its governmental capacity. It is true that in *Vale* v. *Boyle,* 179 Cal. 180, [175 Pac. 787], attention was called to the difference between the governmental and

proprietary powers of the city in determining whether or not certain sections of the charter regulating the purchase of supplies (sec. 1, art. II), applied to supplies purchased for public utilities. What was said on that subject was only to reinforce the construction of the language of the charter fully determined by other rules of construction and was wholly incidental to the question. This is made clear by the following language of the opinion, to wit: "While it is true that this general consideration alone should not control the express language of section 1, chapter 3, article II of the charter, if applicable thereto, it aids us in construing such general provisions of the charter concerning the purchase of supplies, etc., to consider that they were adopted for the purpose of regulating the conduct of the board of supervisors, acting in their governmental capacity." The point at issue must be determined by the language of the charter and not by the fact that in its ownership and control of public utilities the city acts in a proprietary capacity. Returning, then, to a consideration of the language of the charter we find that section 14, *supra*, first deals with "public work authorized by the supervisors to be done under the supervision of the board of public works," and provides that such work, "unless otherwise determined by the board of public works," must "be done under written contract, except in case of urgent necessity." The board of public works thus have a right to determine whether such work shall be done under written contract. The first exception is in the case of "urgent necessity." The next clause, "and except as otherwise specifically provided in this charter, the following proceedings shall be taken *in all cases* in the matter of the letting of contracts by said board" (italics ours), would seem to include not only the matter of letting the contracts authorized by the supervisors, but also the letting of contracts directly authorized by the charter; in other words, "all cases." The next sentence confirms this view: "Before the award of any contract for doing any work authorized by this article, the board shall cause to be posted," etc. While the clause, "and except as otherwise specifically provided in this charter the following proceedings shall be taken *in all cases* in the matter of the letting of contracts by said board," is in a sentence dealing with only these classes of contracts "authorized by the board of supervisors to be done under

the supervision of the board of public works," it is evidently intended to have a broader application, namely, to apply to "all cases" where contracts are let by the board. The clause represents a break in the line of thought equivalent to the beginning of a new sentence, introducing the method of procedure to be followed as outlined in the next and succeeding sentences, which provide for " . . . the award of *any contract* for doing *any work* authorized *by this article,* . . . " etc., so that all work contracted for by the board of public works, whether authorized by the board of supervisors or by article VI of the charter, is to be contracted for in accordance with section 14, "unless otherwise specifically provided in the charter." The contention of the respondents is thus narrowed down to this proposition, namely, that the matter of contracting for the construction of public utilities is expressly regulated by subdivision 8 of section 9, and therefore comes within the above exception contained in section 14, to wit: "and except as otherwise specifically provided in this charter." The argument, then, is that the matter of letting of contracts for public utilities is controlled not by section 14 of the charter, but by the ordinances of the supervisors upon that subject, enacted by authority of the charter (sec. 9, subd. 8, *supra*), which provides that the board of public works " . . . may in accordance with such ordinances . . . contract for work to be performed . . . " It seems fairly apparent that the effect of this section, construed in connection with section 9, subdivision 8, *supra,* is to require all contracts let by the board of public works to be let in accordance with the procedure prescribed by sections 14 et seq., except in case of those contracts concerning public utilities where the procedure to be followed is regulated by ordinances enacted by the board of supervisors.

[2] It will be helpful in determining the intent of the people in adopting these charter provisions, to consider the history of the adoption of section 9, subdivision 8, *supra.* Such history is uniformly considered in dealing with kindred subjects, such as the interpretation of constitutions. At the time of the formulation of the amendment to section 9, subdivision 8 of chapter 1 of article VI, the action of *Vale* v. *Boyle, supra,* was pending. The limitations upon the power of the board of public works to deal with public utilities was raised by the plaintiff in that case, which was begun January 15,

1918. On May 27, 1918, the superior court of San Francisco granted a temporary injunction, holding that the board of public works was required to invite bids for supplies in accordance with section 1, chapter 3, article II of the charter. The charter amendment to section 9, subdivision 8, *supra,* was formulated and by ordinance submitted to the people of San Francisco October 21, 1918, to be voted for at the next general election (November 5, 1918). Four days later this court reversed the decision of the trial court in *Vale* v. *Boyle, supra,* and held that section 1, chapter 3, article II did not apply to such purchase of supplies. At the election the proposed amendment was carried and was approved by the legislature January 21, 1919 (Stats. 1919, p. 1376). The controversy in that case was as to whether or not the board of public works was required to follow the charter provisions for the purchase of supplies, or to follow the ordinance of the supervisors regulating the purchase of the automobile buses for the purpose of conducting a public utility. The existence of this controversy over the power of the board of public works to purchase supplies, in any other manner than in accordance with the charter provisions regulating the purchase of supplies, so seriously affecting, as it was claimed in that case, the power of the board to effectively operate the public utilities then owned, and to contract for supplies for the Hetch Hetchy project then under construction, shows that the purpose of the amendment was to exempt the board of public works when purchasing supplies for such utilities from following the routine method provided by the charter and held by the trial court to apply to purchases for the municipal street railroad. This purpose is readily deducible from the language used in the amendment, to wit: "Full authority is vested in the board of public works to carry out the powers granted in this paragraph, *and it may in accordance with such ordinances as the supervisors may enact contract for* work to be performed or *materials or equipment to be furnished,"* etc. (Italics ours.) It is to be observed that the same provision is made concerning "materials or equipment" and concerning contracts "for work to be performed." Both are to be done in accordance with the ordinances of the board of supervisors. If it was the intent to relieve the board of public works from the charter provisions applying generally

to the purchase of "all supplies" it would seem equally clear that the purpose was to also relieve them from similar restrictions concerning the making of contracts for public work. That this court, after the language of the charter amendment was formulated and submitted, held such charter provisions concerning the purchase of supplies not to be applicable, does not change the intent of the framers of the charter amendment. An examination of the language of the amendment, as well as a consideration of the circumstances under which it was formulated, tends to confirm this conclusion. The clause "full authority is vested in the board of public works to carry out the powers granted in this paragraph" has no force unless it relieves the board of public works of restrictions upon their authority contained in other portions of the charter. The expression "full authority" indicates a purpose to remove limitations upon authority and an intention to remove such general restrictions as might otherwise be deemed applicable. It focuses the attention upon the particular paragraph in which the powers are granted and to the limitations upon that power contained in that paragraph as alone applicable. This paragraph, in effect, reads thus: "Full authority is hereby vested in the board of public works over the construction, maintenance and operation of all public utilities, and it may in accordance with such ordinances as the supervisors may enact, contract for work to be done," etc. The subdivision clearly deals with the method of contracting for public utility construction, and authorizes contracts therefor "in accordance with such ordinances as the supervisors may enact." Under sections 14 and 22, chapter 1, article VI, the method of contracting for public work is rigidly prescribed. Those provisions may be summarized as follows: Notice inviting proposals for the work shall be posted and published for not less than five days. The notice must fix the day and hour when the bids are to be received. They must be sealed. The notice must contain the general description of the work, the time within which it shall be commenced and when completed, the amount of bonds to be required, and refer to plans and specifications on file in the office of the board for full detail and description of the work. They must be upon printed forms, accompanied by an affidavit of noncollusion. The bids must be clearly and distinctly written, without any

erasure or interlineation. They must be accompanied by a certified check; only one bid to be presented by each bidder. The method of opening and considering the bids, the method of signing the contracts, the execution of the bond, the provision in regard to the method of payment of the contractor, are all regulated in great detail. The award must be to the lowest bidder. It is apparent that if these charter provisions concerning the letting of contracts for public work by the board of public works control the letting of contracts for constructing public utilities, the whole field of regulation is quite fully covered and there is nothing of importance left for the supervisors to provide for by any ordinance regulating the method of contracting. It is true that the phrase in subdivision 8 of section 9, "in accordance with such ordinances as the supervisors may enact," might be given some effect by construing it as authorizing the board of supervisors to determine what portions of the work are to be let by contract, leaving the method of advertising for and entering into contracts to be regulated by the charter. But this result is already fully accomplished by the opening clause of section 9: "The board of public works shall have charge, superintendence and control, *under such ordinances as may from time to time be adopted by the supervisors;* . . . 8. Of the *construction,*" etc. This general introductory phrase in section 9 in regard to the ordinances of the board of supervisors relates to and affects every portion of subdivision 8 of section 9, and the above phrase in subdivision 8 of section 9, to wit: "in accordance with such ordinances as the board of supervisors may enact," is wholly unnecessary and redundant unless we construe it to apply to the *method of entering into contracts* for work to be performed and to direct that such ordinance is to control upon that subject. If the phrase under consideration is eliminated from section 9, subdivision 8, and it is thus made to read. "and it may . . . contract for work to be performed or materials or equipment to be furnished," such contracting would still be under the general power and supervision of the board of supervisors by virtue of the opening clause of section 9, giving the board of public works control, etc., "under such ordinances as may from time to time be adopted by the supervisors." The authority to let contracts in accordance with the method prescribed in the charter would be

in the board of public works, and would be subject to the general regulatory power of the supervisors. In order to change the method of letting contracts it was essential that other and additional language should be employed in subdivision 8, *supra*, and this, we think, was done in a very direct and effective manner by the declaration that the board of public works might contract for work "in accordance with such ordinances as the supervisors may enact" for that purpose. [3] It is a fundamental rule of construction that effect should be given to all the language of a charter, constitution, or statute, and unless this last-mentioned phrase accomplishes this much it accomplishes nothing and the charter is to be construed exactly as it would be without such phrase. [4] The use of this phrase in connection with the emphatic provision that "full authority is vested in the board of public works to carry out the powers granted in this paragraph" makes it plain that the supervisors are authorized by ordinance to regulate the method of entering into contracts for the work described in subdivision 8 of section 9, namely, the construction of public utilities, notwithstanding the general scheme for entering into contracts for public work contained in section 14 of that article (VI). Another consideration tends to the same conclusion. Previous to the amendment of the charter of 1919, *supra*, the power to acquire or construct public utilities was vested in the city. (Art. XII, sec. 14.) No express provision being contained therein with reference to the construction of such utilities, the power to make provision for such construction would be vested in the legislative body of the city. The provisions requiring contracts for public work to be let by the board of public works, contained in the charter at that time in sections 14 et seq., *supra*, related solely to contracts executed by them, and had no application to contracts let by the supervisors, and therefore had no application to contracts for the construction of public utilities. Prior to the amendment of 1919, therefore, the supervisors by ordinance could provide the method of entering into contracts for the construction of public utilities, and when this power was taken from them and vested by the charter amendment in the board of public works, it was not unreasonable to provide for the retention by the supervisors of the power of regulating the method of entering into contracts for such construction, and

CLXXXIV Cal.— 9

that is, in effect, what was done by the charter, which authorized contracts to be let under ordinances adopted by the board of supervisors regulating that subject. As has been pointed out, section 14 expressly excepted from its operation contracts otherwise specifically provided for in the charter. The provision for the letting of contracts in accordance with the ordinances of the supervisors in subdivision 8 of section 9, chapter 1, article VI, was no doubt intended to be such a specific provision therefor as was excepted from the operation of section 14.

WHAT DID THE SUPERVISORS MEAN BY THE COST–PLUS–FEE PLAN WITH A GUARANTEE?

Appellants contend that the board of public works failed to conform to this ordinance in advertising for bids and in letting the contract. We will next examine such contention. The ordinance of the board of supervisors, No. 5107, passed March 22, 1920, authorized the board of public works "to call for and receive sealed proposals and to enter into contracts on the basis of such proposals for the construction of one or more or all portions of said water supply and works, said proposals and contracts to be based on the so-called cost-plus-a-fee plan with a guarantee by the contractor that the total cost to the city shall not exceed a specified maximum price per unit." With reference to the letting of such a contract it is provided in section 2, "that after comparing proposals received for doing the work the board of public works may in its discretion award the contract either to the bidder submitting the lowest maximum cost guarantee, or to the bidder proposing to do the work for the lowest contractor's fee." The ordinance also contained the following provision:

"Sec. 3. All such contracts shall provide that inasmuch as the city and county is to pay the actual cost of doing the work, within the guaranteed limit, no expenditures chargeable to the city and county shall be incurred for labor, material, supplies or equipment required for such work, except upon the prior written authorization of the city engineer and board of public works, and only to the extent of such authorization. Said contracts may also provide for progressive payments of the contractor's fee. . . .

"Sec. 4. The provisions of the charter requiring the retention by the city and county of twenty-five per cent of the

amount of contractor's payments until completion of the
work shall not be held applicable to such annual advance
payments allowed contractors, but shall apply to all other
payments on account of the contractor's fee.   The provisions
of the charter applicable to general contracts by the city
requiring a bond for the protection of laborers and material-
men shall not be considered as applicable to cost-plus-a-fee
contracts where all labor and material bills are paid directly
by the city and county, and no such bond shall be required.''

Purporting to act under the authority of this ordinance
the board of public works, on April 6, 1920, advertised for
bids ''for the construction of aqueduct tunnels in the moun-
tain division of the Hetch Hetchy project, on a cost-plus-fee
basis.   Contract No. 77C, Hetch Hetchy water supply.''   It
was provided in this notice that ''the amount of bond for
faithful performance of contract has been fixed at one hun-
dred thousand dollars.''   In pursuance of this proposal the
Construction Company of North America made its bid,
wherein it proposed and agreed, if its proposal was accepted,
''to take charge of and superintend the work mentioned in
said advertisement and described in the specifications re-
ferred to in said advertisement and to furnish the necessary
organization for carrying out said work in accordance with
the specifications . . . and subject to all conditions contained
in said specifications, for the total sum of $1,190,329.20. . . .
The undersigned, in further consideration of the acceptance
of this proposal, hereby guarantees that the unit costs to
the city of said work, determined in the manner provided
in the specifications, including the total sum above men-
tioned, but excluding the general overhead costs of the city's
engineering and administrative offices in San Francisco and
at Groveland, will not exceed the sums named in the schedule
of guaranteed maximum unit costs attached to and forming
part of this proposal, and agrees that if the actual unit
costs to the city of San Francisco, so determined, exceed such
guaranteed costs, the total amount of such excess on all work
to which the same applies may be deducted from any pay-
ments due to or withheld from the undersigned under the
contract.''   The award of contract followed the language of
the proposal, awarding the contract No. 77C to the re-
spondent Construction Company of North America ''to take
charge of and superintend the work mentioned in the ad-

vertisement for the above-mentioned contract and described
in the specifications referred to in said advertisement and
to furnish the necessary organization for carrying out said
work in accordance with the specifications therefor . . . for
the total sum of $1,190,329.20.'' It contains the same pro-
visions with reference to guarantee of unit cost contained in
the bid. Apparently the bids were made on blanks furnished
by the board of public works. Contract No. 77C, executed
in accordance with these proceedings, provided that the
respondent contractor ''promises and agrees . . . that it will
do and perform all of the following work . . . for the con-
struction of aqueduct tunnels in the mountain division of
the Hetch Hetchy project on a cost plus fee basis, with
guaranteed maximum units costs, and awarded to the con-
tractor above named by the board of public works. . . . ''
It also contained the same guarantee with reference to unit
cost contained in its proposal and in the award of the con-
tract hereinabove quoted. The board of public works on
behalf of San Francisco, subject to the provisions of the
specifications, agreed to pay a fee of $1,190,329.20. The
specifications provide for payment of the contractor's fee as
follows:

''First. In the event that the contractor has submitted a
bid requiring annual advance payments, as soon as the con-
tract has been signed and the contractor has undertaken the
work, in order to cover the initial cost and expense to which
the contractor estimates he will be put in undertaking his
work for the first year, the city will pay to him the amount
specified in his bid as his advance payment for the first
year.

''Second. At the expiration of each successive period of
three months succeeding the date on which the contract is
signed, and during which the contract is in force, or until
ten such payments have been made, the city will pay to the
contractor one-eleventh of the entire amount of his bid fee
(excluding the contractor's estimated annual advance pay-
ments, if they are required by his bid), less twenty-five per
cent of said one-eleventh, and also less the amount of any
excess of actual unit costs over guaranteed unit costs, de-
termined as hereinabove set forth.

''Third. At the commencement of the second and third
years respectively succeeding the date of signing the con-

tract, the city will pay to the contractor the entire amount of the advance payment estimated by the contractor for that particular year, if such an estimate is included in his bid, plus such addition or minus such deduction as the board of public works may find proper, to make such advance payment equal to the contractor's actual advance costs for that year. The finding of the board of public works as to the extent to which these annual advance payments shall be modified, if at all, shall be binding and conclusive, and if said finding is not acceptable to the contractor, or if he does not express his acceptance or rejection of said finding within ten days from the date at which he is notified of the same the contract shall be declared terminated by the board of public works and shall be of no further force or effect.

"Fourth. When the contract shall have been completed to the satisfaction of the board of public works, or at the termination of the same if due to the failure of the contractor to accept the board's modification of his second or third annual advance payment, as above provided, the city will pay to the contractor the total sums withheld under the twenty-five per cent retention clause in paragraph second of this section, plus the unpaid one-eleventh of the bid fee, less any deductions which the city engineer may find necessary or proper under the terms of this contract, either on account of the maximum guarantee clause or otherwise. The decision of the city engineer as to the items, amounts and propriety of any such deductions shall be binding and conclusive upon both parties hereto. Acceptance of such final payment by the contractor shall constitute a complete settlement of all obligations of the city under this contract and a release of the city from the obligation to pay any further sums whatever.

"The contractor, in fixing the amount of the annual advance payment in his proposal, shall include in the amount of such payment only the initial cost and expense to which he considers he will be put in undertaking his work for each year, and not any current expenses or profit, which should be distributed through the year."

In considering the contention of the appellants that this contract and award does not comply with the ordinance, it will be necessary to further consider the terms of the ordinance. The fundamental inquiry is, What is meant by the

"so-called cost-plus-a-fee" plan and guarantee, etc. [5] The phrase "cost-plus-a-fee," disassociated from the other parts of the ordinance and construed solely with reference to its language and not with reference to any technical significance attached to the term, would seem clearly to indicate that the city was to pay the cost of doing the work, that is, for labor and material and other expenses of the contractor, and to pay the contractor a fee for his services. The term is used to distinguish the plan of contracting by which the services of the contractor are secured for the management and oversight of the work in accordance with the usual custom of contractors, but without obligation on the part of the contractor to insure that the building will cost no more than the contract price, or, on the other hand, without an opportunity for him to make more than his previously agreed percentage or fee. This type of contract, we understand, is largely an outgrowth of war conditions. In a paper presented before the American Society of Engineers, printed in the proceedings, volume 45, No. 46, pages 443–449, and also printed in the Canadian Engineer, volume 38, page 183, Ernest W. Clarke discusses the distinction between ordinary contracts for the construction of buildings and improvements, which he refers to as "lump sum contracts," and the "cost-plus" type of contract. He makes the following statement: "The usual methods of paying for work are by lump sum, by item charges, and by cost plus a percentage. Under the first two methods the contractor takes the engineers' or architects' specifications and estimates of the quantities, possibly checks the latter by his own computation, guesses at the interpretation which will be placed by the owner's representatives on the terms of the specifications and, from his knowledge of cost of materials and cost of labor, makes up a bid. In a lump sum contract the preliminary estimate of quantities is final, as are also the original plans of foundations, details, etc. Any changes must be a matter of settlement between the owner and the contractor. The latter takes all the gamble, and if conditions or quantities turn out more favorably than was anticipated, he wins; otherwise he loses, or is tempted to decrease the cost to himself by some method which generally means a poorer grade of work than that contemplated in the specifications. If conditions turn out much worse than anticipated

by the contractor, he may forfeit whatever bond he put up and leave the owner and bondsmen to settle.'' The tendency of such contracts, Mr. Clarke points out, ''is to remove responsibility from the owner and his representatives and place it on the contractor; also, all the gamble on the weather, foundations, changes in labor and material market, and every other unknown or unknowable factor is carefully unloaded on him. The contractor accepts all this, but the owner pays. . . . In 'cost plus' contracts, the owner accepts all risks, all costs, and receives the benefit of all favorable conditions; each job carries its own load only, without the addition of losses on other jobs and without the percentage added by the contractor to offset possibly unfavorable conditions, ambiguous specifications, or captious owners. . . . The contractor furnishes the plant, organization and expert knowledge of construction and buying; the owner supervises the work and pays the bills. . . . The sliding percentage with maximum fee, as used on government work, could be applied to any contract, large or small. Contracts could be let on the basis of fee demanded, both percentage and maximum, on the size, adaptability and condition of the plant controlled by the bidder, and on his experience, reputation and the size and character of his organization. It is true that the interest of the owner to keep down the cost, and that of the contractor to receive a large fee, would clash, but that is controlled by the sliding percentage which can be arranged to give an actually larger fee for smaller total cost, and by the maximum fee which is based on the owner's estimate of total cost.''

Mr. A. E. Wells, president of a Chicago construction company, in The Heating and Ventilating Magazine for October, 1919, vol. 16, page 27, under the title ''Building Construction Under the Cost-plus-fixed-fee Contract,'' calls attention to the distinction between the lump sum contract and the cost-plus-a-fee contract. ''The question being asked to-day is, 'Should the contractor insure the owner that his structure will not exceed a definite contract price?' In competitive bidding the cost of this insurance is paid generally by the low bidder out of profits, or, as frequently happens, out of his capital, for the reason that he is more likely to get the contract as he scales down his allowances for contingencies. In fact, the man whose bid includes a safe allowance for

insurance against higher costs cannot expect to obtain work under the competitive bidding system. The inevitable result is the bankruptcy of many contractors and an additional cost to the owner or the surety company to complete the unfinished contract. This situation has come to such a point that surety companies are refusing to write surety bonds on fixed price contracts except under especially favorable conditions and they frequently recommend to owners the cost-plus-a-fixed-fee contract. But from the owner's standpoint is it not preferable to know in advance what a certain project will cost? It is true that a careful estimate is due him. It should be made by a reliable contractor and checked by owner's architect and engineer. Such a figure should be more satisfactory than a competitive bid which does not necessarily show the cost of the building but only what some contractor is willing to gamble is the cost of the job.'' Mr. Wells concludes as follows: ''Unquestionably the contractor is called in because he is an expert in building and not to absorb the risk entailed in the lump sum contract. If it is not the purpose of the owner to buy price insurance along with his building then cost-plus-fixed-fee is a better basis.'' In support of this conclusion, an address of Brigadier-General R. C. Marshall, Jr., chief of the construction division of the U. S. War Department, given before the Associated General Contractors of America, November 21, 1918, at Chicago, is quoted from. General Marshall said that as a result of war conditions ''there was developed a form of contract known as the cost-plus-sliding-scale-fee contract.'' He had secured the opinion of a committee of eminent business men unqualifiedly indorsing this form of contract. General Marshall made the following statement: ''No contractor should be called upon nor permitted to undertake the performance of any contract that within the four corners of the paper upon which it appears is or may be written the financial bankruptcy of the contractor. It is unjust, it is inequitable, it is uneconomic. The great lesson of this war on the subject of the relationship between the contractor and the owner is the 'cost-plus' contract. This represents the only equitable basis under which a contractor may perform constructive and economic services for the owner. It is the only form of contract which affords protection to both parties. To me all the energies, the thought and experience

of this country within its own continental lines during the
past year and one-half of this world struggle shall have been
in vain unless out of it shall grow, as a permanent institu-
tion, solidifying the economic relationship between the
contractor and owner, the 'cost-plus' contract.'' Mr. Wells
further stated in his article: ''Our standard contract calls
for a return to the owner of ninety per cent of such savings,
all of which would have accrued wholly to the contractor
under the lump sum plan. We believe ten per cent of the
savings to be an adequate incentive for the contractor.''

George W. Fuller, consulting engineer, New York City, in
Municipal and County Engineering for July, 1920, discusses
the ''cost-plus-a-fee'' contract and states: ''Prior to the great
war, the 'cost-plus' form of payment on contracts in the
waterworks field was limited to a relatively few large pro-
jects built as a whole under this type of contract for private
corporations and to numerous small, unexpected features
of enterprises executed under municipal contracts where
'extra work' clauses were attached to either lump sum (bulk)
or unit price contracts. During the war a large amount
of emergency government work which had to be performed
in the shortest possible time gave great impetus to the 'cost-
plus' form of contract. The unstable condition of the market
for labor and materials now found in many places causes
this form of handling construction work to come up re-
peatedly for discussion. Such discussion results from the
necessity for finding expedients to meet present emergencies
which, while not comparable with those of the war period,
are nevertheless present during this reconstruction period
to an extent which is perhaps not generally recognized. At
this time when contractors are sorely puzzled to know how
to bid on construction materials on which quotations are
made by dealers only on the basis of changes in price con-
tingent on the actual date of future deliveries, and when
labor is uncertain in quantity and of reduced and somewhat
uncertain efficiency as to output of work per hour, it is
obviously necessary to look conditions squarely in the face.
Add to this the difficulties in transportation of construction
materials and the loss incident to the contractor having a
substantial pay-roll for labor when materials to work with
are lacking, and it is readily seen that this is a time for
considering fundamental principles in handling construction

work to an extent that would not be of interest under normal conditions. . . . Some waterworks construction must go forward. With conditions as they are at present the contractor, if he bids on a lump sum or unit price basis, he is bound to name a price which in his opinion will protect him from loss and if possible assure a reasonable return on his capital investment and for the work of himself and his organization. Under these circumstances it is important to discuss briefly the cost plus form of contract with a view to seeing if the burden of uncertainty in some respects cannot be shifted from the contractor to the owner to the advantage of all concerned. In fact, if construction work is to go forward there are some projects where such steps seem imperative. . . . It is claimed that under the cost plus method a contractor has little incentive to keep down the cost of the work. This is frequently true of the cost plus percentage, but need not be true of the cost plus lump sum type. In any case it must be remembered that a contractor who will deliberately be inefficient on a cost plus project is equally sure to attempt improper or inadequate construction on lump sum or unit price agreements. There have been a great many variations of the cost plus contract applied to construction work, but the more important are:

"1. Actual proved cost with labor and material furnished without restriction by the contractor—plus a fixed percentage or lump sum, to represent profit, supervision, financing, use of tools and plant, or any or all of these.

"2. Actual proved cost of labor furnished by the contractor and with materials furnished by the owner, with a fixed percentage, or lump sum, as above.

"3. Actual proved total cost for specified work plus a percentage for specified or unexpected extra or unforeseen work in connection with lump sum or unit price contracts.

"4. Actual proved total cost to the contractor plus a sliding scale fee and upset maximum fee.

"5. Actual proved cost to the contractor plus a fixed charge and fixed construction fee."

Under the head of "Advantages claimed for cost plus contracts," ten specifications are given by Mr. Fuller. The eighth one is as follows: "8. Cost plus contracts do away with the substantial sums usually added in lump sum or

unit price contracts to cover the following uncertainties:
(a) Weather; (b) Foundations; (c) Changes and shortages
in labor market; (d) Changes and shortages in material
market; (e) Delayed deliveries of materials." Under the
head of "Disadvantages" he gives eleven specifications, the
first of which is as follows: "1. There is no way of deter-
mining the approximate cost in advance and this upsets
budgets where definite appropriations have been made or are
required." Mr. Fuller's paper, from which the above quo-
tations are taken, was presented before the annual conven-
tion of the American Waterworks Association on June 24,
1920, at Montreal, Quebec. (See, also, Engineering News
Record, vol. 85, p. 78, July, 1920.) In Engineering and Con-
tracting, volume 52, page 728, a form of cost-plus contract
used by Bent Brothers in Los Angeles is published. It ap-
pears form this contract that the constructor agrees to a
definite estimated cost which it is stipulated is based upon
certain unit prices, some of which are specified in the con-
tract. It is agreed that the estimated cost may be increased
or reduced by reason of the increase or decrease in price of
the items. The constructor's fee is a percentage of the esti-
mated cost and is known as the estimated fee. If the actual
cost of the work is less than the estimated cost, the con-
structor, in addition to his estimated fee, is paid one-half of
the amount saved over the estimated cost. If the cost of
the work is more, the constructor pays half the loss, "except
that in no event shall the constructor be paid less than one-
third of the constructor's estimated fee."

These quotations clearly indicate the distinction between
the flat contract basis and the cost-plus-a-fee basis of con-
struction contracts. It is apparent from the whole scheme
that the purpose of the supervisors in authorizing this form
of contract was to make a contract less hazardous to the con-
tractor than the flat price contract. If we accept the appel-
lants' contention that the guarantee of maximum unit cost
places all the cost over that amount upon the contractor, it
is difficult to conceive of a contract less favorable than this
to the contractor. Without any hope of profit he agrees to
assume all possible loss. If the work costs less than the
maximum guarantee, he does not profit by that fact, but if
it costs more, he pays such additional cost. Not only that,
if there is an advance in any one item of cost over the esti-

mate, the contractor suffers the loss, while if there is a lowering of cost, on any other item, the city gets the benefit of it. For instance, if the cement costs one million dollars more than the estimate, the contractor pays it. If there is a saving of one million dollars on labor and other items of cost the city gets the advantage of this saving. The estimated or guaranteed cost would be the actual cost, but the contractor would suffer a loss of one million dollars. Such a construction of the ordinance absolutely ignores the fact that the whole purpose of the cost-plus-a-fee contract is to shift the burden of market fluctuations upon the owner instead of on the contractor. Whatever name may be appropriate to the form of contract said to be devised by the board of supervisors of San Francisco, it certainly is not a "so-called cost-plus-a-fee contract," that is, a contract "generally styled" a "cost-plus-a-fee contract." (Webster.) The form of contract which shifted the hazard of increased cost upon the owner resulted from the fact that millions of young men were being withdrawn from industrial pursuits, that the government was calling millions of men to service and planning to call all the available men to service needed to overcome an enemy whose victories had already cost the world millions of lives. Our attention has been called to no contract approximating in character to that contended for by the appellants. The report of the United States Shipping Board of December 1, 1918, shows the letting of contracts aggregating over two billion dollars for ships. The nearest approach to the contract here involved, as construed by appellants, is, to quote from the report, that on "a fee basis by which the bidder submitted a proposal to build for a sum not to exceed a certain figure, and to take a certain fee in return for his services, with provision for bonus shared between builder and corporation in case cost fell below the estimated cost." A consideration of this form of contract at once discloses that it does not purport to be on a "cost-plus-a-fee basis," and that the contractor has a chance of an additional profit over his fee. And it further appears from the report that the government pays any additional cost due to increased cost of labor or material. It should be noted, too, that the employees in such work were in the preferred service list and thus the industry was relieved from the hazard of having its men called to service,

and that every shipyard was given all the contracts it could possibly carry out, and that the government taxed excess profits. Such a contract could not be appropriately styled a cost-plus-a-fee contract, but rather "estimated cost plus a fee plus increased cost" or "estimated cost plus estimated profit plus a fee plus increased cost."

The interpretation of the ordinance contended for by appellants ostensibly throws the hazard of all loss on the contractor, but in fact it throws it on the materialmen and laborers. The laborers are employed and paid only with the consent of the city. The material is purchased and paid for only by such consent. The contractor is, in effect, the agent of the city up to the guaranteed maximum price unit. If this is the limit of the power of the board of public works and the contractor to bind the city, thereafter the contractor must pay all labor and material. The work then has arrived at a point where all future cost is a loss to the contractor and to be paid from his fee or from his private resources. There is no bond to protect the laborers or materialmen. Such a bond is expressly waived by the supervisors (Ordinance, sec. 4, *supra*), although ordinarily they would require a bond of over four million dollars on a contract of this amount. There is no retention of twenty-five per cent (over two million dollars) for the benefit of laborers or materialmen. [6] In short, the facts that the supervisors waived this bond, that they provided for advance payments of actual cost, that they fixed no amount of bond for the faithful performance of the contract, that they made no provision for the payment of labor and material after the maximum guaranteed cost had been exceeded, except for payment direct by the city, and waived the usual bond to secure them, lead to the conclusion that it was their intention that in any event the city should pay the actual cost, and that the contract price should be such "cost-plus-a-fee." The contract and specifications involved here seem to combine several features of the cost-plus-a-fee contract described by George W. Fuller, *supra*. The fourth form of such a contract provides for "an upset maximum fee."

Unless the innovations provided on the cost-plus-a-fee plan by the supervisors in their ordinance absolutely destroy the fundamental basis of such a plan, and substitute in lieu thereof a peculiar plan of their own, the guarantee of the contractor

referred to in the ordinance must relate to and bear upon the amount of his fee. It must have been intended that the contractor was to agree that the maximum cost should be a certain amount and that his fee was to be affected and limited by that agreement. The provision of section 3 that the contract shall recite "that inasmuch as the city and county is to pay the actual cost of doing the work, within the guaranteed limit, no expenditures" shall be incurred except upon the prior written authorization of the city engineer and board of public works might indicate otherwise. But the statement of the guaranteed limit contained in this provision is a mere recital as a basis for the agreement that the city engineer is to have supervisory power over the incurring of expenses. This recital ought not to control the fundamental basis of the whole scheme contemplated by the adoption of the cost-plus-a-fee plan. If the contractor instead of bidding a lump sum had specified a percentage of the cost as a basis of his compensation—and he might have bid on that basis—and if we substitute for the word "guarantee" the word "agreement"— for that is what is intended—we have an agreement that the contractor shall receive a certain percentage of the cost of the work, coupled with an agreement that the work shall not exceed a certain maximum, and an implication that if it does exceed that maximum his percentage of profit shall be limited to the agreed maximum. If we assume there is any basis for the appellants' contention, we have to consider the additional fact that the board of public works received proposals upon the same basis from all contractors bidding on the cost-plus-a-fee basis; that these bids were a great deal less than the flat contract basis; that the contract was let in accordance with the proposal in the bids, and that afterward the board of supervisors passed a resolution setting aside bonds for the payment of this contract, and, in effect, ratifying and confirming it.

With reference to the subsequent action of the board of supervisors, the rule is thus stated in Black on Interpretation of Laws, section 95: "A construction put upon a statute by the legislature itself, by a subsequent act or resolution, cannot control the judgment of the courts; but it is entitled to weight and consideration in case of doubt or obscurity. . . . Thus, while the legislature cannot, by resolution, change the obligation of a contract made under a previous act, yet if

they instruct a public officer as to his duties under the contract, such legislative expression of opinion as to what has been done, and the resulting duties of the officer, may be resorted to in determining the intention of the legislature in passing the act," citing *Georgia Penitentiary Co.* v. *Nelms,* 65 Ga. 67. (See, also, *State* v. *Hackmann,* 275 Mo. 47, [204 S. W. 513] ; *Board of Commrs.* v. *Alexander,* 58 Okl. 128, [159 Pac. 311, 316].) The fact that the board of supervisors, within a few weeks after the adoption of this ordinance authorizing the board of public works to solicit proposals for the performance of this work, in effect ratified and approved the contracts entered into by the board of public works under the authority of that ordinance, points significantly to the fact that in using the comparatively recent phrase "cost-plus-a-fee" they did not intend to throw upon the contractor all the hazards due to an increased cost of the work, and that the guarantee therein referred to had relation to the amount of the contractor's fee, and that the guarantee with reference to such maximum unit cost contained in the contract actually entered into was the kind of a guarantee they intended to secure in enacting the ordinance. In the resolution set up as exhibit "J" to the complaint, adopted by the supervisors and approved by the mayor, appropriating two million seven hundred and nineteen thousand dollars to be expended out of the proceeds of water bonds, it is stated, "which proceeds are to be placed in the water construction fund for the purpose of paying the estimated expense of executing contract No. 77C, board of public works, for the construction of mountain division aqueduct tunnels on the Hetch Hetchy project, on a cost-plus-a-fee basis with guaranteed maximum unit prices during the year commencing with and following the date of said contract." This is an express declaration by the board of supervisors and the mayor that the contract in question was one "on a cost-plus-a-fee basis with guaranteed maximum unit prices." If in the ordinance the supervisors had used terms of fixed legal significance, their subsequent interpretation would not be binding on the courts. But they have used a phrase in the formative stage, and we think accurately. But if these phrases lack precision, the subsequent conduct of the supervisors is sufficient, under the circumstances, to justify the interpretation which we place on the ordinance, namely, that

it authorizes the contract entered into by the board of public works.

To recapitulate the argument bearing upon the proper construction of the ordinance of the board of supervisors authorizing the board of public works to advertise for bids on the basis of the so-called cost-plus-a-fee contract.

1. The *sine qua non* of the cost-plus form of contract is the payment by the city of the cost of the work.

2. Section 4 of the ordinance declares that in the cost-plus form of contract the city is to pay for all labor and material.

3. There is no express provision in the ordinance that the contractor is to reimburse the city for the cost of labor and material paid to laborers and materialmen.

4. No bond is required to secure laborers ond materialmen, such a bond being expressly waived.

5. The usual twenty-five per cent of money due under the contract, retained to secure laborers and materialmen and to secure the city in the faithful performance of the contract, is waived.

6. No provision is made for an adequate bond to secure the city for the repayment to it of money paid to laborers and materialmen. While the usual bond for the performance of the contract would cover this agreement, the amount of such bond is not fixed by the supervisors, but is left to the discretion of the board of public works.

7. The purpose of the guarantee of maximum unit cost by the contractor is to form a basis of his fee if the bid is on a percentage basis, or, if not, in such manner as the board of public works may determine by its form of proposals and contract.

8. The board of supervisors have themselves interpreted the ordinance to mean exactly what the board of public works construed it to mean, and in case of doubt we should follow this interpretation.

As an answer to the foregoing considerations it is suggested that the guarantee contemplated that the contractor was to pay all cost over and above the agreed maximum; in other words, that the *sine qua non* of the guarantee is that the contractor pays the cost of the work. We would thus have the supervisors in one sentence using two irreconcilable terms, one phrase requiring the city at all hazards and in all events to pay the cost of the work, and the other requir-

ing the contractor at all hazards and in all events to pay the cost of the work. On the one hand, we have a construction of the ordinance which resolves the ambiguities thereof in favor of the cost-plus basis, and on the other a construction which resolves the ambiguities in favor of the payment of the cost by the contractor.

In response to the considerations which point to the conclusion that the supervisors were seeking a practical solution of a practical problem, and were endeavoring to secure bids from contractors upon a basis more favorable to the city than the lump sum contract, and that the contract which throws all the hazard upon the contractor and removes from him all hope of profit resulting from decreased cost is less favorable to him than a lump sum contract, it is answered that the contractor will protect himself by making an outside estimate which will make it practically certain that he will not suffer loss. To this argument we reply that the imputation of such an intent to the board of supervisors is to assume that the provision in the ordinance in regard to a guarantee was considered by them to be absolutely valueless, because to secure a guarantee of a certainty would be of no value to the city; that is to say, if it was assumed that a contractor would bid two or three times the estimated cost of the work as his maximum guarantee, so as to be certain that he would suffer no loss, the guarantee becomes valueless. The guarantee is only valuable on any theory when it is assumed that it is possible, and even probable, that the actual cost will exceed the guaranteed maximum. If we assume that each bidder will fix an exorbitant maximum—say, forty or fifty million dollars—then it is obvious that the only real competition in bidding would be as to the amount of the fee, for the maximum guarantee would be of no value to the city. We are thus brought by this process of reasoning to the very conclusion that we reached by the opposite course of reasoning, namely, that the intent of the board of supervisors was to secure competition in the amount of the fee bid. The difference in the two courses of reasoning is that by the former we uphold the validity of the contract here involved and permit the construction of the Hetch Hetchy project, as was clearly contemplated by the supervisors, and by the latter we hold the contract invalid and temporarily retard or permanently destroy the Hetch Hetchy project.

We have assumed in the foregoing discussion that the city attorney has correctly interpreted the contract entered into for the performance of this work, and that the provision in such contract for a guarantee that the maximum unit price should not exceed the amount therein specified was so far modified by the contract, with reference to the retention of parts of the fee due the contractor, that the maximum security of the city is one hundred and twelve thousand dollars. Mr. Justice Sloane has taken a different view of the contract, and we do not·enter into that discussion for the reason that we prefer to base our decision upon the interpretation adopted by the parties in the case. Upon this basis, if we assume that the aggregate of the maximum unit cost cannot exceed the amount of the respondent contractor's bid, to wit, $7,802,952.80, the contract should have been awarded to R. C. Storrie & Co., whose bid fee was $1,074,285.60, because in each case the city pays the cost of the work and the fee of the contractor, and the difference between the two fees is $116,044 in favor of R. C. Storrie & Co. It is only when we assume that the actual cost of the work would be one hundred and twelve thousand dollars more than $7,802,952.80 that the basis of the two bids become at all equal, for the bid of the respondent contractor abates as the cost exceeds its guarantee, and it is for the reason that it was contemplated that the maximum unit cost would affect the compensation of the contractor, that the supervisors, in section 2 of the ordinace, provided that the contract might be awarded "either to the bidder submitting the lowest maximum cost guarantee, or to the bidder proposing to do the work for the lowest contractor's fee," for, as has been said, if the maximum bid is so great that it bears no real relation to the cost, the bid should be let on the basis of the lowest contractor's fee.

## RATIFICATION.

The question as to whether or not the resolutions adopted by the board of supervisors subsequent to the execution of the contract, in furtherance thereof, constituted a ratification of the contract so as to bind the city, is not discussed in the briefs. It is clear that the board of superivsors, having power to prescribe the method of entering into the contract, would have power to ratify a contract executed without the formalities prescribed by them, as distinguished from such

formalities as might be required by the charter. The resolutions adopted by the supervisors are not only significant as pointing to the proper interpretation of the ordinance prescribing the method of the letting of the contract, but are also significant as legislative action ratifying the contract. There can be no question that if the resolutions passed by the board of supervisors subsequent to the letting of the contract are proper expressions of the legislative will, equal in effect to an ordinance, that the subsequent ratification makes immaterial the original intention of the board of supervisors as expressed in the ordinance authorizing the letting of the contract, and we see no escape from the proposition that under the charter of San Francisco, the resolution in question, having been enacted with the formality prescribed by the charter for both ordinances and resolutions, is equivalent to an ordinance in its effect. This matter will be more fully discussed in the consideration of the next point.

## DOES THE CONTRACTOR'S BOND COMPLY WITH THE ORDINANCE?

Appellants contend that the bond given by the contractor does not comply with the charter provisions regulating that subject (sec. 21, c. 1, art. VI), for the reason that it is not a bond for the faithful performance of the contract, and that, although signed by a surety company, there is only one surety instead of two. In this connection it is pointed out that although the Political Code authorizes the acceptance of one corporate surety company instead of two individual sureties, such section does not apply to the letting of contracts by a city, which is a municipal affair. Section 21, *supra*, provides as follows: "At the same time with the execution of the contract, the contractor shall execute to the city and county and deliver to the secretary of the board a bond in the sum named in the notice for proposals, with two or more sufficient sureties to be approved by the board, or shall deposit with the secretary a certified check upon some solvent bank for said amount, for the faithful performance of the contract. No surety upon any bond other than lawfully authorized surety companies shall be taken unless," etc. The claim that the bond is not one for the faithful performance of the contract results from the fact that in the bond it is expressly provided that it is not intended as a guarantee of the estimated maximum cost. [7] Inas-

much as the contract itself on that subject merely requires that the guarantee shall be the amount of the unpaid fee in the hands of the owner, the bond substantially complies with the requirements of a bond for the faithful performance of the contract. The respondents' only answer to the claim that the bond should have been signed by two sureties is that the universal practice of the city has been to require only one surety company and that the point was not raised in the court below, but is raised for the first time on appeal. With reference to the latter point it is sufficient to raise the question in this court that the pleadings and stipulation of the parties and findings of the trial court show that the contract was signed by only one surety company. Nor would the proof of a contrary custom, directly in the face of the charter requirements, be of any value. If, as we have held, the board of supervisors have control over the subject of letting of contracts for public utilities, they also have control of the corollary matter of the execution of a bond for the faithful performance of the contract. In the ordinance providing for the letting of this contract by the board of public works no specific provision was made with reference to the giving of the bond for the performance of the contract. It was merely provided in the ordinance that the procedure outlined in sections 14 et seq., of article VI, chapter 1, should control. The language of the ordinance is as follows: "Sec. 2. The procedure to be followed in soliciting proposals for and letting such contracts shall be, so far as applicable, that prescribed in article VI, chapter 1 of the charter for general contracts let by the city," with certain exceptions which need not now be considered. [8] Assuming that the provision with reference to the method of procedure in letting a contract, contained in the ordinance enacted by the board of supervisors, required that the bond for the performance of the contract be signed by two sureties instead of one, the supervisors had the power to provide in the ordinance for only one surety, as is provided by general law in case of corporate sureties. (Pol. Code, sec. 955.) They also had power after the execution of the contract to waive the requirement of more than one surety. [9] What they had a right to provide for in the first instance they could authorize by way of ratification. (*Chase* v. *Trout,* 146 Cal. 350, [80 Pac. 81].) The resolution of the board of

supervisors of May 3, 1920 (No. 17872), approved by the mayor on that date, reciting the execution of the contract in question, setting aside eight million dollars in bonds to carry it out, appropriating two million seven hundred and nineteen thousand dollars for the first year, accepting the bid of the Construction Company of North America, was a formal ratification of the contract. This ratification was repeated on the same date by a resolution setting aside and appropriating two million seven hundred and nineteen thousand dollars from the proceeds of the sale of said bonds authorized by the foregoing resolution and directing that the "proceeds are to be placed in the water construction fund, for the purpose of paying the estimated expenses of executing contract No. 77C of the board of public works and for the construction of mountain division aqueduct tunnels on the Hetch Hetchy project on a cost plus a fee basis with guaranteed maximum unit prices, during the year commencing with and following the date of said contract," and on the same date by another resolution appropriating $276,776.40, "in payment to the Construction Company of North America as the first annual advance payment, contract 77C, Hetch Hetchy water supply construction (claim dated May 3, 1920)." It is suggested that these resolutions were not effective to ratify the letting of the contract, for the reason that the charter required the supervisors to act by ordinance in providing a method of letting of contracts (sec. 8, c. 1, art. VI, *supra*), and that a ratification by resolution would therefore not be effective. (*McCracken* v. *San Francisco*, 16 Cal. 591; *Grogan* v. *San Francisco*, 18 Cal. 608, 610, 614; *Pimental* v. *San Francisco*, 21 Cal. 362, 363.) **[10]** But in the absence of statutory or charter provision to the contrary, a legislative act may be either in the form of a resolution or of an ordinance. (*San Francisco Gas Co.* v. *San Francisco*, 6 Cal. 190; notes, 34 Am. Dec. 631; Ann. Cas. 1913C, 1321; R. C. L. 19, sec. 194, p. 195.) For many purposes resolutions and ordinances are equivalent terms. (*Los Angeles* v. *Waldron*, 65 Cal. 283, [3 Pac. 890]; *Pollok* v. *City of San Diego*, 118 Cal. 593, [50 Pac. 769]; *Hollman* v. *Shoulters*, 114 Cal. 136, 157, [44 Pac. 915, 45 Pac. 1057]; *Jacobs* v. *Board of Supervisors*, 100 Cal. 121, [34 Pac. 630]; *Hopping* v. *City of Richmond*, 170 Cal. 605, [150 Pac. 977].) "And it has been held that even where the statute or municipal charter requires the muni-

cipality to act by ordinance, if a resolution is passed in the manner and with the statutory formality required in the enactment of an ordinance, it will be binding and effective as an ordinance." (19 R. C. L., sec. 194, p. 895; *Gleason* v. *Barnett*, 115 Ky. 890, [61 S. W. 20]; *Barre* v. *Perry*, 82 Vt. 301, [73 Atl. 574]; *McGilvery* v. *Lewiston*, 13 Idaho, 338, 356, [90 Pac. 348]; *Steenerson* v. *Fontaine*, 106 Minn. 225, [119 N. W. 400].) The charter of San Francisco, although providing that all legislative action shall be by ordinance (art. II, c. 1, sec. 8), expressly authorizes in section 13 the passage of resolutions providing for the appropriation or disposition of public property or the expenditure of public money. It is thus provided that this particular form of legislative action may be had by either ordinance or resolution. After providing the identical procedure for the passage of ordinances and resolutions, it is provided that bills and resolutions of the type specifically described in section 13, which includes resolutions for the "appropriation or disposition of public property or the expenditure of public moneys," etc., shall after passage be presented to the mayor for approval. It is then provided: "The mayor shall return such bill or *resolution* to the board within ten days after receiving it. If he approve it he shall sign it and it shall then become an *ordinance.*" With reference to the passing of such ordinance or resolution over the veto of the mayor it is provided that after such passage "the presiding officer shall certify that fact on the bill or resolution and when so certified the bill shall become an ordinance with like effect as if it had been approved by the mayor. If the bill or resolution shall fail to receive the vote of fourteen members of the board it shall be deemed finally lost." The only difference that we have noted concerning the passage and authentication of ordinances and resolutions is that relating to the enacting clause of an ordinance. It is provided in the charter (sec. 8, c. 1, art. II) as follows: "Every legislative act of the city and county shall be by ordinance. The enacting clause of every ordinance shall be in these words: 'Be it ordained by the people of the city and county of San Francisco as follows.' No ordinance shall be passed except by bill and no bill shall be so amended as to change its original purpose." But the provision in regard to the enacting

clause has been held to be directory. (*City of Napa* v. *Easterby,* 76 Cal. 222, [18 Pac. 253].)

[11] We see no escape from the proposition that the proceedings of the board of public works in the letting of the contract and the taking of the bond were ratified by the subsequent resolutions of the board supervisors in the appropriate manner for such ratification, that is, by the appropriation of the money for the purpose of carrying out of the contract. Such appropriations were made in accordance with the provisions of the charter. The resolutions in question were adopted in accordance with the charter and approved by the mayor and were equivalent to ordinances for the same purpose, if they did not in fact become ordinances by reason of such approval and in accordance with the above-quoted provision of section 16, chapter 1, article II.

## TAXPAYER CANNOT COMPLAIN OF INFORMALITY IN BOND.

There is another reason why the judgment cannot be reversed, because there was only one surety on the bond.

This action being by a taxpayer, the question is whether he is in a position to raise the point as to the insufficiency of the bond where it is executed by a surety company, and where the general law specifically provides that only one surety company is essential upon a bond in any case provided by law. (Pol. Code, sec. 955; Code Civ. Proc., sec. 1056.) The appellants are no doubt correct in the contention that the giving of such bond was a municipal affair and, therefore, controlled by the city charter, but no allegation is made and no contention raised that the surety is not amply sufficient. The bond has been approved both by the board of public works, as required by section 21 of the charter, and inferentially by the board of supervisors. The bond would be binding upon the surety company, notwithstanding there was only one surety. (*Kurtz* v. *Forquer,* 94 Cal. 91, [29 Pac. 413]; *Weir* v. *Mead,* 101 Cal. 125, [40 Am. St. Rep. 46, 35 Pac. 567]; *Stimson Mill Co.* v. *Riley,* 5 Cal. Unrep. 218, [42 Pac. 1072].) No case has been called to our attention in which it has been held that a contract such as this is invalid by reason of the failure to give a proper bond, and in a number of cases it has been assumed that the giving of a bond expressly required by statute is not essential to the

validity of the contract. (*Plummer* v. *Kennedy*, 72 Mich. 295, [40 N. W. 433]; *Wells* v. *Board of Education*, 78 Mich. 260, [44 N. W. 267]; *Huebner* v. *Nims*, 132 Mich. 657, [94 N. W. 180]; *Smith* v. *Hubbell*, 142 Mich. 637, [106 N. W. 547].) In this state we have been very liberal in the application of the rule permitting taxpayers to bring a suit to prevent the illegal conduct of city officials, and no showing of special damage to the particular taxpayer has been held necessary. (*Gibson* v. *Trinity County Supervisors*, 80 Cal. 359, [22 Pac. 225]; *Winn* v. *Shaw*, 87 Cal. 631, [25 Pac. 968]; *Barry* v. *Goad*, 89 Cal. 215, [26 Pac. 785]; *Santa Rosa Lighting Co.* v. *Woodward*, 119 Cal. 30, [50 Pac. 1025]; *Clouse* v. *City of San Diego*, 159 Cal. 434, [114 Pac. 573]; *Osburn* v. *Stone*, 170 Cal. 480, [150 Pac. 367].) The rule has now been crystallized into a statute (Code Civ. Proc., sec. 526a). **[12]** We think that our decisions point to the conclusion that the taxpayer should not be permitted to maintain an action based upon the mere informality of a bond, where no showing is made or suggested of injury either to the public or to the taxpayer. In *Ransome-Crummey Co.* v. *Bennett*, 177 Cal. 560, [171 Pac. 304], plaintiff sued upon a street assessment. The proceedings were *in invitum*. The charter provided that where a bond for the faithful performance of a contract for street work was executed by a surety company, such company must be organized under the laws of the state of California. The bond given was not executed by a company so organized. The court said: "The question is whether under these circumstances the fact that the surety on these bonds, otherwise good and sufficient, was not of the class designated by the charter, is available as a defense in an action to foreclose the lien of the assessment. We think this question is correctly answered in the negative by what was said and held in *Miller* v. *Mayo*, 88 Cal. 568, [26 Pac. 364], and *Greenwood* v. *Morrison*, 128 Cal. 350, [60 Pac. 971], and on further consideration we are satisfied that *Manning* v. *Den*, 90 Cal. 610, [27 Pac. 435], decided nothing to the contrary. It follows that the facts embraced in this finding constitute no defense to plaintiff's action." If in proceedings *in invitum* the failure to give the kind of bond required by the charter is insufficient to avoid the contract made in the exercise of the taxing power of the city, it follows irresistibly that a taxpayer ought not to be

allowed the extraordinary remedy of injunction to prevent the carrying out of a valid contract because of such informality, where no showing whatever is made of actual injury to the taxpayer. It has been said that injury will be presumed from a failure to comply with the law (*Santa Rosa Lighting Co.* v. *Woodward, supra*), but such presumption cannot be applied under the circumstances here shown.

## THE AUDITOR'S CERTIFICATE CONCERNING AVAILABILITY OF PROCEEDS OF MUNICIPAL BONDS.

Appellants contend that the indorsement by the auditor upon the contract in question was insufficient to comply with the requirements of article III, chapter 1, section 10 of the charter, and that the proceedings for the setting aside of the sale of the water bonds for the payment of the expenses of the contract does not conform to the charter provisions in that regard. The charter provision in regard to the indorsement upon the contract is as follows: "Provided, that where the expense of executing such contract is to be paid entirely from the proceeds of bond issues, the requirements of this section may be satisfied through an indorsement by the auditor that a sufficient number of bonds have been set aside to be sold as payments under the contract fall due, and from the proceeds of which sale the estimated expense of executing such contract may be paid, as certified by the board or officer making the same." The certificate of the auditor upon the contract is in the following language: "In accordance with the provisions of article III, chapter 1, section 10 of the charter of the city and county of San Francisco, I hereby indorse upon the within contract my certificate that by Resolution No. 17872, New Series, of the board of supervisors of the city and county of San Francisco Water Bonds of the issue of 1910, in the amount of eight million ($8,000,-000) dollars have been set aside, to be sold as payments under the contract to which this indorsement is attached fall due, from the proceeds of which sale the estimated expense of executing such contract may be paid; that said amount of bonds is sufficient for such purpose, according to the certificate of the board making such contract; that prior to this indorsement the contractor has agreed in writing to purchase such bonds, in such amount and at such periods of time, for par and accrued interest, as will enable the treas-

urer to make payments in cash under such contract as such payments fall due and are approved." The agreement of the contractor was to purchase on or before the day when each advance annual installment of the fee became due an amount of bonds sufficient to take care of the total amount of expenditures required under the contract for the next ensuing year, and the amount agreed to be purchased for the first year was three million and fifty-two thousand dollars, the bonds to be purchased at par and accrued interest. The contention of the appellants is that this arrangement for the sale of bonds did not conform to the charter provisions and that therefore the certificate was in effect untrue. The contention is as follows: "The contract in question assumes to be one not for the present sale, but for the future sale in installments, upon the happening of future events, one of which may not happen within one year, and one of which may not happen within two years from the date of the contract. The sales assumed to have been consummated by this contract were not sales to the highest bidder nor are the sales over the treasurer's counter to any applicant at a price not less than par and accrued interest fixed by the supervisors; which are the only methods of sale prescribed by the charter." We think this position is not well taken. The purpose of requiring the auditor's certificate was to submit to him the question of whether or not he would have in the treasury at the time payments were due under the contract sufficient funds to meet these payments. Under the agreement entered into between the contractor and the city he would have such funds on hand for the payment of the amounts due under the contract. The charter (sec. 10, *supra*) specifically provides: "If bonds are withheld, arrangements shall be made prior to the auditor's indorsement for the sale of such bonds in such amounts and at such periods of time as will enable the treasurer to make payments in cash under such contract as such payments fall due and are approved." This provision of the charter specifically requires that the arrangement for the sale must be made before the auditor's indorsement. It contemplates the future delivery of the bonds "in such amounts and at such periods of time as will enable the treasurer to make payments in cash under such contract as the payments fall due." The charter contemplates two things: First. An indorsement upon

the contract of the fact that there is a balance in the treasury available for the payment of the moneys to fall due under the contract. It matters not that this money may have been derived from the sale of bonds. If the bonds have been sold and the money is in the treasury, the certificate of the auditor is in accordance with the fact. Second. If, on the other hand, the bonds have not been sold and have been set apart by the supervisors to meet the obligation under the contract, it is essential that such arrangement be made for the sale of the bonds at future times and in such amounts as will make it certain that the city will have cash on hand to fulfill its obligation to pay cash. The mere setting aside of bonds would not take care of the obligation of the city, and there could be no assurance of the ability so to do in the absence of an actual arrangement or contract for the sale of the bonds at such times and in such amounts as is needed to meet its obligation under the contract. If the arrangements for the sale of bonds were violative of such fundamental provisions of the charter as that the bonds should be sold for not less than par and accrued interest, we should go behind the certificate of the auditor to inquire into the actual facts in the suit of a taxpayer alleging those facts. So far as we can see, no direct requirement of the charter is violated and the very provision of the charter which requires the certificate of the auditor to be attached to the contract certifying that bonds have been set aside to be sold, and that "from the proceeds of which sale the estimated expense of executing such contract may be paid" implies a sale in advance of delivery. [13] We think that the supervisors have regularly followed the authority vested in them with reference to the sale of bonds and that the auditor has complied with the requirements of the charter essential to the validity of the contract.

### FRAUD IN SALE OF BONDS NOT CHARGED.

In the oral argument it was claimed that the arrangement for the advance fee each year was a subterfuge, to take care of the discount necessary to market the bonds. The argument is substantially as follows: That the court will take judicial notice of the fact that government bonds and other similar bonds bearing four and a half or five per cent interest cannot be sold on the market for par; that therefore,

the agreement of the contractor to purchase the bonds at par is not in good faith, for the reason that he could not afford to purchase the bonds at a loss, and hence it must be assumed that the advance payment to be made before or at the time of the purchase of the bonds was intended as a discount on the bonds. The question of whether or not the form of the contract entered into by the city with the contractor was a subterfuge to avoid the provision of the charter requiring the bonds to be sold at par and accrued interest was not raised in the trial court. It is suggested, however, that the facts speak for themselves and from the admitted facts it must be held that this was the purpose of the city and of the contractor. If there is any fraud or collusion in the matter, it was not alleged and cannot be considered by us. All presumptions of law are in favor of the good faith of public officials, and there is nothing in the case other than the facts as stated which give color to any complaint of collusion. [14] Assuming that it is true that the contractor will use a part of his fee in the purchase of bonds, it is no more illegal than it is for him to use any other money belonging to him for the purchase of the bonds. It is his money and, in the absence of fraud or collusion, he can do with it as he pleases.

We conclude that the contract was valid and that the injunction against the payment of the contract price should be denied.

The judgment is affirmed.

Lawlor, J., and Lennon, J., concurred.

SLOANE, J., Concurring.—I concur in the conclusion reached by Mr. Justice Wilbur, but I do not agree with his opinion construing the contract of guaranty as specified in the ordinance. I cannot accept the construction placed upon Ordinance 5107 that the requirement for a contractor's guaranty that the ''cost to the city shall not exceed a specified maximum cost per unit'' applies alone to the contractor's fee. There are four references to this guaranty in the ordinance. First, the board of public works is authorized to invite proposals and let contracts ''on the basis of cost-plus-fee with guaranteed maximum cost to the city and county.'' Second, the board is authorized to enter into con-

tracts for the construction of "said water supply and works, said proposals and contracts to be based on the so-called cost-plus-fee plan with a guarantee by the contractor that the total cost to the city shall not exceed a specified maximum price per unit." Third, there is the provision that the board of public works may in its discretion award the contract to the bidder submitting the "lowest maximum cost guarantee, or to the bidder proposing to do the work for the lowest contractor's fee." Whatever this last paragraph may mean, it seems clear that the maximum cost guaranty referred to in the first clause is not the contractor's fee indicated in the second clause. The fourth reference is to the fact that "the city and county is to pay the actual cost of doing *the work* within the *guaranteed* limit," and providing that no expenditure chargeable to the city and county shall be incurred for labor and material, supplies, or equipment required for *such* work except on written authorization, etc. The cost and work here referred to as being within the guaranty are clearly the cost and work of the whole contract. It furthermore is an incontrovertible fact that all the parties to the proceedings under this ordinance, in the proposals, specifications, acceptances, and contract have treated this required guaranty as applying to the total maximum cost of the entire work, including the contractor's fee.

These considerations are conclusive to my mind 'that the guaranty named in the ordinance was intended as a security against any excess unit cost of the entire construction work.

But, with this interpretation of the ordinance I concur in the conclusion of Justice Wilbur that the contract cannot be held invalid for failure of compliance with either the charter or the ordinance, first, because, as pointed out in Justice Wilbur's opinion, the resolutions adopted by the board of supervisors were in legal effect a ratification of the contract; and, second, because if there was not a valid ratification, the acceptance of the contract rests upon a reasonable interpretation by all the parties of the guaranty requirement.

This court is agreed upon the vital point of the opinion that the supervisors had the power under the amended charter to authorize by ordinance a departure from the procedure therein prescribed for negotiating public contracts. They did by ordinance change the procedure not only in adopting the cost-plus-fee plan, but by demanding a guaranty

from the contractor where the charter required a surety bond. It is fair to presume that the contract of guaranty as executed and accepted was the security contemplated by the ordinance.

The ordinance authorizes the board of public works to enter into a contract on the so-called cost-plus-a-fee plan "with a guarantee by the contractor that the total cost to the city shall not exceed a specified maximum price limit."

Pursuant to this requirement the contractor, in the contract as executed with the board of public works, agrees as follows:

"The contractor hereby guarantees that the unit costs to the city of such work determined in the manner provided in the specifications, including the contractor's fee hereinafter mentioned, but excluding the general overhead costs of the city's engineering and administrative offices in San Francisco and Groveland will not exceed the sum named in the schedule of guaranteed maximum unit costs; and agrees that if the actual unit costs to the city of San Francisco so determined, exceed such guaranteed costs, the total amount of such excess on all work to which the same applies may be deducted from any payments due or withheld from the contractor under the contract."

Stopping with the words "unit costs" preceding the semicolon, we have, so far as is necessary to bind the contractor, an express guarantee as required by the ordinance.

I doubt if there is anything in the subsequent language which modifies the liability of the contractor. The added terms are not a limitation upon the guaranty, but a supplementary provision for securing the liability assumed to the extent of any unpaid moneys due the contractor.

It is claimed that the bond which was given to secure performance of the contract expressly construes the above agreement and exempts both the surety and the principal from any liability "*on this bond*" for the guaranty, and limits the liability of the principal to "a charge against said principal as provided in such specifications."

The provisions of the specifications referred to do not contain any limitation upon the liability of the contractor under the guaranty, but it is the manner of ascertaining the amounts to be deducted from the contractor's fee that is referred to as being "provided in the specifications."

This proviso in the bond, of course, destroys any recourse on the bond for such maximum excess costs, but it cannot and does not purport to construe the extent of the principal's liability on the guaranty, but, on the contrary, refers to the contract for the measure of his liability; and, in my opinion, after having made an express guaranty covering any extent of excess maximum cost, it cannot be held to have been limited by a supplemental agreement in the nature of an assignment of moneys remaining in the hands of the debtor, as partial security for the promise.

But even conceding, as seems to be the construction of the parties themselves, that the contract of guaranty limits the contractor's liability thereon to such deductions as may be made from his stipulated ·fees, is there such a failure to comply with the requirement of the ordinance in this regard as to nullify the contract? There is at least a partial guaranty, and who shall say that it is not a full and complete protection to the city against its liability for any excess maximum unit costs that may happen or that were within the contemplation of the board of supervisors?

In this consideration of the sufficiency of the guaranty most of the reasoning in the opinion of Mr. Justice Wilbur in his analysis of the nature and purposes of a cost-plus-a-fee contract applies. In determining the character and extent of the guaranty required, we may properly consider the nature and limitations of the relation of the parties under the contract. All of the purchases and expenditures were to be made by the city and were under its immediate control. No greater liability need be assumed than the city approves. The specifications provided for frequent estimates of the progress of the work and the maximum unit costs indicated. The city reserved the right to curtail expenditures and suspend operations at any time it saw fit, and was empowered to hold out from the contractor's fees twenty-five per cent of all amounts other than the advance payments, and after the first year such portion of the yearly advance payments as the board of public works from its investigations finds necessary to cover any excess over the maximum unit costs.

Before this contract was finally entered into it had been certified by the city engineer as his opinion that the work could be completed within the agreed maximum limits. The contract and guaranty were accepted and ratified by the city

with knowledge of the form of the guaranty. No question is raised in the pleadings as to there not having been a sufficient compliance with the terms of the ordinance in this respect. Indeed, the plaintiffs recite in their complaint that the board of public works "acting under authority of Ordinance No. 5107 and not otherwise" awarded this contract on the contractor's bid, and that thereafter "a contract in writing in accordance with such proposal made by Construction Company of North America, and such acceptance thereof by the Board of Public Works . . . was executed." This proposal referred to contained the same provision of guaranty as is incorporated in the contract. The answer of the city and county of San Francisco avers that under the authority of Ordinance No. 5107 the successful bidder was to assume charge and superintendence of the construction of said waterworks under the direction and control of the city engineer. All labor and material bills were to be paid directly by the city and county of San Francisco, "but no such expenditures were to be incurred except upon the previous written approval of the Board of Public Works." Materials, supplies, and expenditures were to be purchased directly by the city in accordance with the usual procedure. The contractor, however, was to guarantee that the unit costs of the various classes of work involved would not exceed the sums specified in the bids. It is further alleged in the answer that a bid was received from the defendant Construction Company of North America. That the guaranteed maximum price of the bid was approximately two million dollars less than any competing bid; that its acceptance was recommended by the city engineer; that it was accepted by the board of public works and the contract "was finally awarded under specification No. 76C to the Construction Company of North America."

It is stipulated in the record that all the allegations of the answer are to be taken as true.

These recitals constitute an admission that the contract contained a guarantee as required under the ordinance.

Even on this appeal no serious question is raised by appellants as to a sufficient compliance with the ordinance in the matter of this guaranty.

Certainly in the light of all these facts there cannot be said to have been such a failure to comply with the require-

ments of the ordinance as will render the contract void and
inoperative at the petition of a taxpayer.

The point is urged that the contractor's guaranty should
have been secured by the statutory bond required by section
21 of article VI, chapter 1, of the charter. It is there pro-
vided:

"Every contract entered into by the Board of Public
Works shall be signed," etc.; "and at the same time with the
execution of the contract the contractor shall execute to
the city and county, a bond named in the notice for pro-
posals, for the faithful performance of the contract."

Ordinance No. 5107 directs that in soliciting proposals and
letting such contract the provisions of the charter shall be
followed so far as applicable.

But the performance of the guaranty is not an obligation
that comes within the terms of the charter provision quoted.
The primary contract here was the agreement on the part of
the contractor to organize, superintend, and carry on the
work of construction which was to be financed by the city
itself. As security for the faithful performance of this
service he furnished a bond in the penal sum of one hundred
thousand dollars fixed by the board of public works. It was
the city's part of the obligation to authorize the expenditures,
purchase the materials, employ the labor, and pay the bills.
It was further required of the contractor in consideration of
his employment that he secure the city against loss by a
guaranty that the work would be completed for a specified
maximum unit cost. This might have been accomplished by
requiring the execution of a surety bond. Instead the super-
visors by ordinance elected to take as their security the per-
sonal guarantee of the contractor. They might have stipu-
lated that he furnish the guarantee of John D. Rockefeller,
or John Smith, in which event it would not be claimed that
by virtue of the charter requirements he must supplement
such guaranty by a bond for its faithful performance. His
performance of the guaranty was no part of the original
obligation of employment. It was a secondary obligation of
indemnity against possible excess in cost in the city's part of
the contract. In the absence of this agreement the burden
of any excess cost would fall on the city.

Let us suppose, again, that the ordinance had required the
contractor to execute a mortgage, or place in escrow a sum

of money, to secure against this excess cost; would it be contended that he must secure the performance of this condition by a bond? On the contrary, the execution of the mortgage or escrow would be performance, just as here the contract of guaranty, with the creation of a lien on the contractor's fee, was performance. Not performance of the secondary obligation to pay in the event of an excess cost, but performance of the agreement to pledge his credit as security against such excess, the agreement to guarantee.

When the supervisors elected to take the contractor's personal obligation for security rather than to exact a bond, they exercised the power possessed under subdivision 8 of section 9 of article VI, chapter 1, of the charter, empowering them to vary by ordinance the method of procedure in the matter of public utilities.

The provision of the ordinance for the contractor's guaranty was a modification in this respect of the charter procedure, and it may be fairly inferred was intended to supply such indemnity as would otherwise be required under the charter by a bond. It may be conceded that just what form of guaranty was contemplated does not appear from the ordinance. The board of public works interpreting and acting upon this authorization entered into this agreement with the contractor fixing the maximum unit costs and accepting in lieu of the charter bond this form of guaranty or indemnity against an excess cost. It certainly is some form of a guaranty. Both the board of public works and the board of supervisors have recognized and ratified it as a compliance with the charter and the ordinance.

It is a recognized rule of construction of a statute or ordinance that its contemporaneous interpretation by those charged with its execution is entitled to consideration. (25 R. C. L. 1043; *Edwards* v. *Darby,* 25 U. S. (12 Wheat.) 206, 209, [6 L. Ed. 603, see, also, Rose's U. S. Notes] ; *United States* v. *Alabama G. S. R. R. Co.,* 142 U. S. 615, [35 L. Ed. 1134, 12 Sup. Ct. Rep. 306] ; *Arnett* v. *State,* 168 Ind. 180, [8 L. R. A. (N. S.) 1192, 80 N. E. 153, 156].)

Another salutary rule is that where a statute is uncertain as to its interpretation, or fairly susceptible of more than one construction, a construction to which it is fairly susceptible may be followed which will avoid unreasonableness, hardship, or even inconvenience (25 R. C. L. 1018).

"If the language is not clear and it is obvious that by a particular construction in a doubtful case great public interests would be endangered or sacrificed, the court ought not to presume that such construction was intended by the makers of the law." (*Pickering* v. *Day*, 3 Houst. (Del.) 474, [95 Am. Dec. 291]; *People* v. *Lambier*, 9 Denio (N. Y.), 9, [45 Am. Dec. 273].)

I think in this case it sufficiently appears that the requirement of the guaranty was intended by the ordinance as a substitution for the bond, and that the guaranty executed was in substantial compliance with the ordinance.

Rehearing denied.

Lawlor, J., Wilbur, J., Lennon, J., and Sloane, J., concurred.

Shaw, J., Olney, J., and Angellotti, C. J., dissented from order denying rehearing.