[No. S097450. Apr. 18, 2002.]

JEFFREY HAMBARIAN, Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

## COUNSEL

Marshall M. Schulman; Cleary & Sevilla, Charles M. Sevilla; Geragos & Geragos and Mark J. Geragos for Petitioner.

No appearance for Respondent.

Bill Lockyer, Attorney General, Robert R. Anderson and David P. Druliner, Chief Assistant Attorneys General, Gary W. Schons, Assistant Attorney General, Carl H. Horst and Douglas P. Danzig, Deputy Attorneys General; Tony Rackauckas, District Attorney, David S. Kirkpatrick and Brian N. Gurwitz, Deputy District Attorneys, for Real Party in Interest.

Wiley, Rein & Fielding, David J. Kulik, Kirk J. Nahra and Brian F. Chandler for National Insurance Crime Bureau and Coalition Against Insurance Fraud as Amici Curiae on behalf of Real Party in Interest.

Dennis L. Stout, District Attorney (San Bernardino), Lance A. Cantos and Grover D. Merritt, Deputy District Attorneys, for California District Attorneys' Association as Amicus Curiae on behalf of Real Party in Interest.

## OPINION

**BAXTER, J.**—Once again we are asked to consider the circumstances under which a superior court may or must recuse a prosecutor's office because of

the office's use of consultants compensated by the victim. In *People v. Eubanks* (1996) 14 Cal.4th 580 [59 Cal.Rptr.2d 200, 927 P.2d 310] (*Eubanks*), we found the superior court did not abuse its discretion in ordering recusal of the Santa Cruz County District Attorney's Office which, when faced with a " 'substantial' " debt for consultants in comparison to its resources, had asked the victim to pay the debt as well as "other significant costs of the investigation." (*Id.* at p. 598.) Focusing on "the possible sense of obligation the district attorney would feel for [the victim's] payment of a debt owed by the district attorney's office," we held that "[t]he trial court did not err in concluding these circumstances evidenced a 'reasonable possibility' the prosecutor might not exercise his discretionary functions in an evenhanded manner" and would not have abused its discretion "in finding the conflict so grave as to render fair treatment of the defendants in all stages of the criminal proceedings unlikely." (*Id.* at pp. 598-599, 601.)

In the present case, the superior court declined to disqualify the Orange County District Attorney (District Attorney), which had accepted the services of a forensic accountant employed and compensated by the victim, the City of Orange. We conclude that the superior court did not abuse its discretion and therefore affirm the Court of Appeal.

I

For over 40 years, businesses owned and operated by the Hambarian family have held trash collection and disposal contracts with the City of Orange (City). Under the most recent contract, Orange Disposal Service, Inc. (ODS), agreed to deliver all solid wastes and recyclable materials collected in the City to a material recovery facility for processing and recycling by Orange Resource Recovery Systems, Inc. (ORRS). ORRS agreed to document its costs and provide that information annually to the City, which in turn relied on that information to adjust the rates charged to its residents for trash collection.

Following a 1995 audit of ORRS, certified public accountant Steven Nakada discovered the misappropriation of salvage revenues from ORRS to unknown bank accounts. Nakada identified petitioner Jeffrey Hambarian, a corporate vice-president, and Rod Agajanian, ORRS operations manager, as the perpetrators of a massive fraud that appeared to include money laundering. The apparent purpose of the scheme was to artificially increase ODS's costs and to underreport ORRS's salvage revenues, resulting in higher trash rates for City residents and businesses and higher profits for the Hambarian companies. In February 1997, Nakada—who had been the accountant and financial adviser for the Hambarian companies since 1988—resigned, due in

part to the deterioration of his relationship with the Hambarians and their failure to implement the internal controls he had recommended. However, he continued to bill ODS and ORRS for his services during the companies' transition to a new accounting firm and, until February 1998, for his time spent assisting the City in its investigation of those companies.

When the City learned of possible fraud involving the trash collection and disposal contracts, it initiated its own investigation. In early March 1997, the City retained Arthur Andersen, LLP, to audit the recycling revenues. Nakada worked with Arthur Andersen during this period and continued to bill ODS and ORRS.

Based in part on Arthur Andersen's findings, the Orange Police Department (Police Department) began an investigation in April 1997 into the apparent theft of funds related to the refuse and recycling operations performed by the Hambarian companies for the City. Arthur Andersen assisted the Police Department in the drafting and execution of search warrants and other aspects of the investigation. Because the investigation involved financial and accounting issues, the chief of police sought and obtained authorization from the City to engage a certified public accountant to continue assisting the police in the investigation. On July 1, 1997, Jeff Franzen, a certified public accountant (CPA), entered into a contract with the City[1] to perform accounting services to assist police investigators in their investigation of possible theft or other fraud in connection with the City's contracts with ODS and ORRS, to submit written reports detailing the work performed when required to do so by the Police Department, and to testify in court regarding work performed when required to do so by the Police Department or the District Attorney. During this period, the City (through the Police Department) directed Franzen's conduct of the investigation.

Subsequently, the chief of police determined that his department still did not have sufficient resources to perform what appeared to be a complex, long-term investigation and, at a meeting in early August 1997, asked the District Attorney to assume responsibility for it. The chief agreed to continue supporting the investigation by assigning to the District Attorney, full time, the two investigators who had initiated the investigation, as well as the contract CPA, Jeff Franzen. The chief also offered a third detective on a

---

[1]Because the Police Department's contracting authority was limited to $2,000, the City was the official counterparty to the Franzen contract. The original contract was funded by an appropriation added to the Police Department budget. Subsequent authorizations were paid from the City's sanitation fund. In both cases, Franzen's paychecks, like the paychecks of City police officers and other employees, were issued by the City. The dissenting opinion thus errs in ascribing significance to the superior court's comments that the Police Department was paying Franzen's salary. (See dis. opn., *post*, at p. 846.)

part-time basis. The District Attorney agreed to assume full responsibility for the investigation, and all documents and personnel were physically transferred to the District Attorney's major fraud unit in Santa Ana.

Following this meeting, the City transferred supervision of Franzen to the District Attorney. Franzen's role in the District Attorney's investigation was to perform financial analyses of the documents obtained by the District Attorney. He summarized data and prepared memos, but did not direct the course of the investigation. Once he reached conclusions about what the financial documents meant, he informed the deputy district attorneys or their investigators. Periodically, he prepared loss summaries, which are an enumeration of the various categories of thefts. He has not reported to the city attorney, the city manager, or the city council and has not worked with the City's lawyers in the City's civil suit against petitioner.[2]

As part of the investigation, Franzen visited ODS and ORRS to obtain evidence and meet with employees and participated in the execution of search warrants and interviews of numerous other witnesses. He was "actively" involved in the District Attorney's investigation and met regularly with investigators and attorneys from the District Attorney's Office. Sometimes these meetings have included representatives from the state Franchise Tax Board and the Internal Revenue Service, which is conducting its own investigation.

When Franzen was first retained by the Police Department, he worked out of his home. Following the August 1997 meeting, he "basically" worked out of the District Attorney's offices, where he was given a desk and telephone. He considered himself "a full member of the prosecution team" and the team's expert on financial matters, since no one else on the team performed that function. The District Attorney's investigative auditor, Scott Weitzman, was not involved in this investigation. As part of his training for this investigation, Franzen observed Weitzman testify at a preliminary hearing in a different matter.

---

[2]The "scope of work" of Franzen's contract with the City directed him to "[s]ubmit written reports detailing the work performed when required by the Police Department" and provided further that "[t]he documents, study materials and other products produced by Consultant for this Agreement shall become the property of the City and upon payment by the City for the work involved in their production, Consultant shall deliver all such products to the City prior to payment for same." However, Franzen has submitted only two reports to the City—a report on the ODS's gate fee balance and a report on certain public allegations made by a City-hired consultant concerning the construction costs of the material recovery facility. Those reports initially were presented to the District Attorney "to enable the District Attorney to make a decision on whether or not there were criminal implications involved in these transactions." Subsequent to that review, the District Attorney authorized Franzen to forward the reports to the City. All the other reports prepared by Franzen have been distributed only to the District Attorney and have not been forwarded to the City.

At all stages of the investigation, Franzen has submitted his bills to the Police Department and has been paid by the City. As of the recusal hearing in November 1999, Franzen, who bills at $75 per hour, had been paid a total of $314,155.20. The city attorney has not discussed Franzen's fees with the District Attorney.

On December 15, 1998, the District Attorney filed a 65-count felony complaint that charged petitioner with grand theft, presenting false claims, commercial bribery, breach of fiduciary duty, receipt of corporate property, filing false tax returns, and money laundering. Under those charges, petitioner faces a possible punishment of over 20 years in prison and over $17 million in fines. Petitioner has pleaded not guilty. The preliminary hearing has been stayed pending resolution of this recusal motion.

In May 1999, the Hambarian companies and several other members of the Hambarian family (the Hambarian parties), without admitting fault, entered into a lump-sum settlement of $9.8 million with the City and assigned to the City any claims they might have against petitioner arising out of the trash contracts and any rights to restitution from him under Penal Code section 186.11. The City had previously filed a civil lawsuit against petitioner, his wife, and 15-year-old son, *City of Orange v. Hambarian, et al.* (Super. Ct. Orange County, No. 807419).

In November 1999, petitioner filed a motion to recuse the District Attorney's Office. The motion, inter alia, challenged Franzen's involvement in the District Attorney's investigation. It did not object to the assistance provided by the Police Department investigators. Following an evidentiary hearing, the superior court denied petitioner's motion. The superior court determined that the Police Department had retained Franzen to help with "complex forensic accounting issues and fraud investigation[s]" and that "the fact that the [City] foot[s] the bill for this investigation . . . and then turns the investigation over to the district attorney's office doesn't create a conflict for the district attorney's office." Invoking the two-pronged test we set forth in *Eubanks*, the superior court concluded (1) that "there is no conflict because there is no evidence in this court's view of a reasonable possibility that the district attorney's office may not exercise its discretionary function in an even-handed manner" and (2) that "even if a conflict exists, it is not so grave as to render it unlikely that the defendant would receive fair treatment."[3]

A divided panel of the Court of Appeal denied the petition for a writ of mandate. All three justices agreed that a conflict existed as a matter of law

---

[3]Petitioner also argued that the District Attorney was indebted to the corporate victims ODS and ORRS to the extent that those companies had been billed for Nakada's initial investigation and had then reimbursed the City for a portion of Franzen's salary and a portion of Arthur Andersen's fee as part of the civil settlement. The superior court found that the

because Franzen's impartiality would be affected by "knowing how his benefactor's financial position depended in a substantial measure on his actions and conclusions." They parted ways in their review of *Eubanks*'s second prong. The majority found that the trial court did not abuse its discretion by deeming it unlikely that the District Attorney would be affected by the conflict. Presiding Justice Sills disagreed, concluding that "[t]he victim's paying [for] and placing of an expert witness or investigator inside the bowels of the district attorney's office could only be justified, if ever, in a truly exceptional case."

We granted review.

## II

The standard for a motion to disqualify the prosecutor is set forth in Penal Code section 1424: "The motion may not be granted unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial." We detailed the history of this statute and the associated legal principles in *Eubanks*, where we explained that a "conflict," for purposes of section 1424, " 'exists whenever the circumstances of a case evidence a reasonable possibility that the DA's office may not exercise its discretionary function in an evenhanded manner.' " (*Eubanks, supra,* 14 Cal.4th at p. 592, quoting *People v. Conner* (1983) 34 Cal.3d 141, 148 [193 Cal.Rptr. 148, 666 P.2d 5].) However, "the conflict is disabling only if it is 'so grave as to render it unlikely that defendant will receive fair treatment' " during all portions of the criminal proceedings. (*Eubanks, supra,* at p. 594.) The statute thus articulates a two-part test: "(i) is there a conflict of interest?; and (ii) is the conflict so severe as to disqualify the district attorney from acting?" (*Ibid.*)[4]

Both the majority and the dissenting justices below found that the City's relationship with Franzen created a "reasonable possibility" that the District Attorney may not exercise its discretionary function in an evenhanded manner, which is the first prong of the test. We find it unnecessary to revisit this conclusion because petitioner has failed to show the trial court abused its discretion by finding, under the second prong, that the conflict was not so grave as to render it unlikely that he will be treated

District Attorney was "insulated" from the financial "arrangements" the City had made with ODS and ORRS. Since petitioner has not renewed those objections in this court, we find it unnecessary to consider them. (Cf. dis. opn., *post,* at p. 846.)

[4]In addition to his statutory claim, petitioner makes occasional reference to "due process" principles. However, he nowhere articulates whether those principles apply here and how, if at all, they differ from the state statutory standard. Accordingly, we will discuss only the legal test set forth in Penal Code section 1424. (Cf. *Eubanks, supra,* 14 Cal.4th at p. 596, fn. 8.)

fairly. Under this prong, "the potential for prejudice to the defendant—the likelihood that the defendant will not receive a fair trial—must be real, not merely apparent, and must rise to the level of a *likelihood* of unfairness." (*Eubanks, supra,* 14 Cal.4th at p. 592.)

 The superior court found no evidence showing the District Attorney "is under the influence of any of these victims" and thus concluded that any conflict was "not so grave as to render it unlikely that defendant would receive fair treatment." Petitioner's challenge to that ruling rests primarily on three factors: (1) the "enormous" sum of money the City has paid Franzen while he has worked for the District Attorney, (2) Franzen's "critical position as the sole financial expert investigator" on the case, and (3) Franzen's contractual duty to report his findings to the City. We must review the superior court's factual findings for substantial evidence and, based on those findings, determine whether the trial court abused its discretion in denying the recusal motion. (*People v. Breaux* (1991) 1 Cal.4th 281, 293-294 [3 Cal.Rptr.2d 81, 821 P.2d 585].)

A

As of the recusal hearing, the City had paid Franzen over $314,000 for his work on the District Attorney's investigation. In *Eubanks,* we held that the trial court did not abuse its discretion in ordering recusal where the alleged victim had paid approximately $13,000 toward the costs of the investigation. (*Eubanks, supra,* 14 Cal.4th at pp. 586-587.) Petitioner, comparing the two sums, reasons that recusal is mandated here.

Petitioner's reasoning is faulty. Our decision in *Eubanks* did not purport to fix a limit on the financial assistance that may be provided by an aggrieved victim. Rather, we stated that the trial court would have been within its discretion to find a likelihood of unfairness where the crime victim, Borland International (Borland), was asked to pay for substantial investigative expenses already incurred by the prosecutor. The problem was not the "fact" of the investigatory assistance itself, but the "potential bias arising out of [the district attorney's] sense of obligation to Borland . . . ." (*Eubanks, supra,* 14 Cal.4th at p. 599.) As we explained, no one factor will compel disqualification in all cases; "the entire complex of facts" must be reviewed to determine "whether the conflict makes fair and impartial treatment of the defendant unlikely." (*Ibid.*) Accordingly, a review of the facts in both cases is in order.

 In *Eubanks,* Borland, through a review of the e-mail files of an employee who had recently resigned, discovered that confidential information had been transmitted to a competitor, Symantec Corporation. Borland

contacted police who, in turn, sought investigative assistance from the district attorney's office. The district attorney, in consultation with Borland officials, prepared warrant affidavits for the search of the employee's residence and Symantec headquarters and asked for additional Borland personnel to assist in the search of the computers that would be found there. When Borland suggested that independent consultants be used instead, the district attorney retained David Klausner, who was referred by Borland's outside counsel, and Stephen Strawn, who had worked with the district attorney's office on prior occasions. The district attorney's office, because of budgetary constraints, asked Borland to pay for Klausner's services. Borland agreed and paid the $1,400 bill. (*Eubanks, supra*, 14 Cal.4th at pp. 585-586.)

Strawn continued to work on the investigation after the warrants were executed. When the chief police inspector asked whether Borland "was 'still willing to assist us by carrying the cost of the technicians that were necessary to process this case,' " Borland once again agreed and paid the $9,450 bill. (*Eubanks, supra*, 14 Cal.4th at p. 586.) Borland also paid for a private service to transcribe audiotapes of interviews because of a "clerical backlog" in the district attorney's office that was preventing the in-house staff from transcribing the tapes. (*Id.* at p. 587.)

In discussing the existence of the disabling conflict, we did not rely merely on "the fact of investigatory assistance itself" and consequently declined to hold that a victim's financial assistance of any amount "*necessarily* subjects the defendant to unfair prosecutorial treatment." (*Eubanks, supra*, 14 Cal.4th at p. 599.) We required the defendant instead to show that the financial assistance is of "a nature and magnitude likely to put the prosecutor's discretionary decisionmaking within the influence or control of an interested party." (*Ibid.*) That likelihood existed in *Eubanks* from "the possible sense of obligation the district attorney would feel for Borland's payment of a debt owed by the district attorney's office," an obligation derived from the fact that the district attorney had asked Borland to discharge a sizable debt the office had already incurred. (*Ibid.*) As the Chief Justice pointed out in his concurring opinion, "it would be quite difficult for the district attorney to tell Borland that he has decided not to prosecute Borland's case, after *Borland, at the district attorney's request*, agreed to pay substantial bills that were submitted to, and that were the responsibility of, the district attorney's office." (*Id.* at p. 602 (conc. opn. of George, C. J.).)

Petitioner has not identified anything in the record here, other than the "huge" sum the City has paid Franzen, that would have created a similar sense of obligation. Although Franzen has been paid handsomely for his services, it is also true that Orange County is several orders of magnitude

larger than Santa Cruz County. Moreover, in *Eubanks*, the Santa Cruz County District Attorney testified that, at the time Borland paid the investigative bills, his office was experiencing " 'serious budgetary constraints in a particular fund that we utilize to pay professional and special witnesses and we really had very little money in our budget . . . .' " (*Eubanks, supra*, 14 Cal.4th at p. 586.) Petitioner, on the other hand, has offered no evidence that the financial assistance the City provided was of equal significance to the District Attorney, which already had an investigative auditor, Weitzman, in its fraud unit. Although petitioner is correct that the City's assistance freed the District Attorney's auditor to work on other cases, this would be true of *any* assistance the City might have provided. For example, by collecting and organizing information from internal sources, the City would have saved the District Attorney at least that many person-hours of documentary discovery and review. Or, by dedicating a City police officer or by hiring a private investigator, the City would have freed a full-time District Attorney investigator. That the victim's assistance has freed up prosecutorial resources to work on other investigations does not compel a finding that the prosecutor will feel indebted to the victim.

We therefore cannot agree with the dissent that recusal is required whenever "the victim is paying for a prosecutorial expense that otherwise would have been incurred by the District Attorney's Office." (Dis. opn., *post*, at p. 848.) *Every* type of assistance provided by the victim reduces the true "cost" of the investigation and thus affects the relative costs and benefits of launching or maintaining an investigation. ▉ The test, however, is not whether the prosecution is " 'subject to the same economic restraints that limit all other prosecutions' " (*Eubanks, supra*, 14 Cal.4th at p. 599) but whether the financial assistance is of a nature and magnitude "likely to put the prosecutor's discretionary decisionmaking within the influence or control of an interested party." (*Ibid.*)

▉ The fact that the City was already pursuing its own civil action against petitioner further reduced the likelihood that the District Attorney would have felt a sense of obligation to the City. Even if the District Attorney were to decline to prosecute, the City still would be able to use Franzen's work product against petitioner in the civil action. Since Franzen's work product would not thereby seem a wasted effort, it is unlikely that the District Attorney would feel obligated to the City to pursue the prosecution merely because it had used Franzen's services.

The dissent also suggests that a sense of obligation is created by "the knowledge that for over two years the City has been paying the salary of a financial investigator to aid the prosecution." (Dis. opn., *post*, at p. 848.) Yet

the record indicates that, until the recusal motion was filed, the District Attorney was unaware of the sums the City had paid Franzen. Moreover, the dissent's analysis would prove too much, inasmuch as the District Attorney also had "knowledge" that the City had been paying the Police Department investigators who were assisting in the investigation and who, like Franzen, had been working out of the District Attorney's offices.

Finally, as the People point out, the City is not a private victim. In *Eubanks*, the victim, Borland, was a competitor of Symantec Corporation, whose president and chief executive officer was one of the defendants in the criminal prosecution. (*Eubanks, supra,* 14 Cal.4th at p. 585.) One risk of Borland's involvement in the district attorney's prosecution was that the prosecution itself could be used as a strategic weapon to disrupt and distract a competitor for reasons wholly unrelated to the public administration of justice. (See *id.* at pp. 602-603 (conc. opn. of George, C. J.).) Here, of course, the City had no interest in crippling petitioner or the Hambarian companies in order to obtain a competitive economic advantage. (See *U.S. v. Witmer* (M.D.Pa. 1993) 835 F.Supp. 208, 214 [finding no disabling conflict of interest arising from the involvement of an attorney from the Army, whose "loyalty to his own financial interests and those of other private parties is not brought into play"], affd. without opn. (3d Cir. 1994) 30 F.3d 1489.) The City's interest was instead to secure refunds for its residents for alleged overcharges by defendant and the Hambarian companies—which is precisely the public interest shared by the District Attorney by constitutional mandate. (See Cal. Const., art. I, § 28, subd. (b) ["It is the unequivocal intention of the People of the State of California that all persons who suffer losses as a result of criminal activity shall have the right to restitution from the person convicted of the crimes for losses they suffer"].) To secure those refunds, the City had statutory authority to investigate possible crimes, such as those alleged here, that fell within its geographic jurisdiction (see Pen. Code, § 830.1, subd. (a)(1)), and even to prosecute the misdemeanors itself. (See Gov. Code, § 41803.5, subd. (a).) That it sought to conduct its investigation in conjunction with the District Attorney does not inevitably create a likelihood of unfairness. (See *People v. Parmar* (2001) 86 Cal.App.4th 781, 796, fn. 1 [104 Cal.Rptr.2d 31] [a government entity that "shares the interests of the People at large is not the type of private interest to which a motion to disqualify is directed"].)

This is not to say, however, that the interplay among government entities can never create a disabling conflict of interest (see *People v. Parmar, supra,* 86 Cal.App.4th at p. 796), and we do not intend here to shield all interagency conduct from conflict of interest principles. Yet, as petitioner concedes, the City's status as a government victim *is* a relevant factor in analyzing the

recusal motion. In this case, where the City's goals appear to coincide with the District Attorney's, the City has independent statutory authority to undertake the investigation, and the City does not appear to have any improper strategic interest in the prosecution,[5] the superior court was within its discretion to find that any conflict of interest was not disabling.

Petitioner repeatedly asserts that the City's "gift" of Franzen's expertise "is every bit as likely to make the District Attorney beholden to the victim City as if Franzen's fees were initially an obligation of the District Attorney and then passed on to the City," but offers no explanation of why this would be so. Although a direct solicitation from the district attorney to the victim may not be essential to every recusal motion, such a request *was* the foundation for the finding in *Eubanks* of a "possible sense of obligation the district attorney would feel for Borland's payment of a debt owed by the district attorney's office." (*Eubanks, supra,* 14 Cal.4th at p. 599; *id.* at p. 603 (conc. opn. of George, C. J.) ["[T]he district attorney—knowing the strategic importance of the matter to Borland, and having asked Borland to pay the district attorney's obligations—likely would feel a great sense of obligation to pursue the prosecution and would be reluctant to exercise objectively his prosecutorial discretion."].) Here, by contrast, petitioner identifies no reason why the District Attorney's Office would believe itself similarly indebted, except the sense of gratitude that accompanies the assistance any victim provides the authorities. This is merely another way of asserting that a victim's financial assistance *necessarily* subjects the defendant to unfair prosecutorial treatment, a proposition we rejected in *Eubanks. (Id.* at p. 599.) Certainly, on this record, the superior court was well within its discretion in finding the District Attorney's Office would not feel obligated to the City.

B

Petitioner claims next that a likelihood of unfairness arises from Franzen's direct role in "influencing the prosecutor's decisionmaking" and "running the financial investigation for the District Attorney." There can be little dispute that Franzen, who was retained and compensated by the City and

[5]Petitioner contends that the City relinquished its status as a "public" victim by having acquired, as part of the settlement, the private causes of action the settling Hambarian parties may have had against him. Petitioner has offered no evidence, however, that the City acted improperly in acquiring such rights. Presumably, the assignment of those rights reduced the cash damages the settling parties paid the City. The City undoubtedly hopes to pursue those causes of action as part of its overall effort to make its residents whole from the fraud allegedly perpetrated by the Hambarian companies. Nothing about the assignment of those rights suggests that the City is acting for any interests other than those of the People at large. (See generally *Crowe v. Boyle* (1920) 184 Cal. 117, 156 [193 P. 111] ["All presumptions of [the] law are in favor of the good faith of public officials . . . ."].)

who will be assisting in the City's civil suit, appears to have an interest in the District Attorney's investigation. Yet, even if we indulge petitioner's premise that Franzen is biased, it does not follow that the District Attorney's Office must be recused.

The problem with petitioner's argument is that the record does not support his grandiose claims that Franzen is "the driving force" within the District Attorney's Office to treat petitioner "as harshly as possible, to disable him, and make it more likely the City will prevail in its related civil suit . . . ." True, Franzen is actively involved in the investigation and considers himself "a full member of the prosecution team." But he is not directing the course of the investigation, as petitioner belatedly acknowledges. Franzen analyzes financial documents, summarizes data, and prepares memoranda that are presented to the District Attorney and its investigators, who *are* directing the investigation. Periodically, Franzen has prepared loss summaries and, at the time of the hearing, was preparing a summary of the costs of the investigation. But, at all points, it is the District Attorney's Office that has decided what use to make of Franzen's findings and whether the conduct uncovered was criminal.

Franzen's lack of control over the investigation distinguishes this case from those on which petitioner relies. In *Ganger v. Peyton* (4th Cir. 1967) 379 F.2d 709, 711, for example, the attorney prosecuting Ganger criminally also represented Ganger's wife in a divorce action, which was based on the same alleged assault. The prosecuting attorney offered to drop the assault charge if Granger would make a favorable property settlement in the divorce action. (*Ibid.*) The prosecutor's personal interest in the criminal action—the possibility that the size of his fee would be determined by what he could extract from the defendant—*and* his apparent surrender of his discretion to his private client meant he could not exercise "fair-minded judgment with respect to (1) whether to decline to prosecute, (2) whether to reduce the charge to a lesser degree of assault, or (3) whether to recommend a suspended sentence or other clemency." (*Id.* at p. 713, fn. omitted.) Here, by contrast, Franzen has no control over these critical prosecutorial decisions. By virtue of his specialized knowledge, he naturally serves an important function in the financial investigation. Yet this is true of any expert the prosecutor might retain. The medical personnel who examined Ganger's wife following the assault also had specialized knowledge of critical facts underlying both the criminal and civil actions, but it would not necessarily follow that recusal would be required if a prosecutor were to rely on the medical expert the wife had retained.

After all, it is the public prosecutor, not the witness, who is bound by law, by a canon of professional ethics, and by the Constitution to act in an

impartial manner. The prosecutor, unlike an expert witness, " 'is in a *peculiar* and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer.' " (*People v. Superior Court (Greer)* (1977) 19 Cal.3d 255, 266 [137 Cal.Rptr. 476, 561 P.2d 1164], quoting *Berger v. United States* (1935) 295 U.S. 78, 88 [55 S.Ct. 629, 633, 79 L.Ed. 1314], italics added.) One justification for the requirement of impartiality is that the prosecutor, unlike the expert witness, has broad discretion over the entire course of the criminal proceedings, from the investigation and gathering of evidence, through the decisions of whom to charge and what charges to bring, to the numerous choices at trial to accept, oppose, or challenge judicial rulings. (See *Eubanks, supra,* 14 Cal.4th at p. 589.) But another justification is that the expert witness, unlike the prosecutor, may be called to the stand to submit to cross-examination, "the 'greatest legal engine ever invented for the discovery of truth.' " (*California v. Green* (1970) 399 U.S. 149, 158 [90 S.Ct. 1930, 1935, 26 L.Ed.2d 489], fn. omitted.) The witness's biases may thus be laid bare to the trier of fact, while private influences on the prosecuting attorney are invisible to the fact finder and must be addressed by rule. (See *State v. Culbreath* (Tenn. 2000) 30 S.W.3d 309, 316 ["the foundation for the exercise of the vast prosecutorial discretion is freedom from conflict of interest and fidelity to the public interest"].) In this case, the trier of fact will surely learn of the City's arrangement with Franzen when he is called to testify. (See, e.g., Evid. Code, § 780, subd. (f).) Consequently, recusal is not necessary to ensure petitioner's right to fair treatment during all portions of the criminal proceedings. (Cf. *People ex rel. Clancy v. Superior Court* (1985) 39 Cal.3d 740, 746 [218 Cal.Rptr. 24, 705 P.2d 347].) Indeed, petitioner has not identified a single case in which a prosecutor's office was disqualified because of the influence of a nonattorney participant in the investigation.[6]

Petitioner's attempt to portray the loss estimates performed by Franzen as a uniquely critical component of this financial fraud investigation is unpersuasive. As the People point out, prosecutors routinely rely on loss estimates prepared by the victims. (Cf. CALJIC No. 14.27; 2 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Crimes Against Property, § 8, p. 28.) A prosecutor's decision to rely on that estimate without first obtaining an independent confirmation of the loss does not mean, as petitioner contends, that the People have "ceded the victim the right to shape prosecution decisionmaking." This type of assistance may "influence" the course of the investigation,

---

[6]Some jurisdictions go so far as to permit private counsel for interested parties to prosecute a criminal action "so long as the Criminal District Attorney retains control and management of the prosecution." (*Powers v. Hauck* (5th Cir. 1968) 399 F.2d 322, 325; see also *Faulder v. Johnson* (5th Cir. 1996) 81 F.3d 515, 517-518; *Person v. Miller* (4th Cir. 1988) 854 F.2d 656, 663 [96 A.L.R.Fed. 495].) We express no views whether California law, which "does not authorize private prosecutions" (*Eubanks, supra,* 14 Cal.4th at p. 588), permits attorney assistance of this type.

but that does not mean that the investigation is "under the influence" of the party providing the assistance. "Assistance in investigations and prosecutions does not translate into control." (*Commonwealth v. Ellis* (1999) 429 Mass. 362 [708 N.E.2d 644, 653].)

The dissent contends that Franzen's "critical role" as the financial investigator, whose reports have not been reviewed "by an impartial financial analyst to verify their accuracy and fairness," renders the conflict disabling. (Dis. opn., *post*, at p. 849.) But the availability of an independent accountant to advise the prosecutor about the accuracy and fairness of information supplied by the victim is not the determining factor in evaluating a motion to recuse—otherwise a defendant would prevail on a recusal motion whenever the district attorney has accepted the fruits of the victim's in-house or external inquiry. Rather, the test, as we have stated, is whether the prosecutor's *discretionary decisionmaking* has been placed within the influence or control of an interested party.[7]

In *Eubanks*, we acknowledged that victims of commercial crimes sometimes "may even hire private investigators for external investigation of suspected crimes against the company." (*Eubanks, supra*, 14 Cal.4th at p. 598.) In this case, Franzen, the City's investigator, worked at the offices of the District Attorney in conducting his external investigation. (See *Commonwealth v. Ellis, supra*, 708 N.E.2d at p. 653 [Massachusetts Insurance Fraud Board's provision of "in-kind support to assist the division with the investigation of cases assigned for prosecution . . . presents no problem"].) While unusual, this arrangement did not mean that the District Attorney had surrendered control of the investigation to Franzen. (See *id.* at p. 654 ["The defendants fail to identify any real or potential leverage that the [Insurance Fraud Board] or any insurer had to force the Attorney General's office to abandon its independence and disinterest"]; cf. *F.T.C. v. American Nat. Cellular* (9th Cir. 1989) 868 F.2d 315, 320 ["The prospect of interested decisionmaking and of the appearance of impropriety is substantially lessened where the U.S. Attorney retains control of the prosecution in which the agency attorneys participate"].) Indeed, petitioner does not explain why the proper exercise of the District Attorney's discretion would turn on whether Franzen was operating out of an office at the District Attorney or was providing the same assistance from an office at the Police Department.

The superior court's implied finding below that the District Attorney—not Franzen—was in control of the prosecution is supported by substantial

---

[7]Moreover, the standard proposed by the dissent—i.e., whether the assistance provided by the victim was a "critical" or "crucial" aspect of the investigation (dis. opn., *post*, at p. 849) —is difficult to apply and susceptible to different outcomes as the investigation proceeds.

evidence. Hence, the superior court did not abuse its discretion in finding that Franzen's assistance did not require recusal of the District Attorney. (Cf. *People v. Merritt* (1993) 19 Cal.App.4th 1573, 1581 [24 Cal.Rptr.2d 177] [misconduct of prosecution investigator cannot justify recusal of entire district attorney's office].)

## C

Petitioner also complains that Franzen is required, by his contract, to report on his work to the Police Department when requested to do so and that Franzen's work product is deemed the property of the City. Sharing information with the victim, however, does not as a matter of law create a likelihood that the prosecutor will treat petitioner unfairly. On this point, we find persuasive the analysis of the federal district court in *International Business Machines Corp. v. Brown* (C.D.Cal. 1994) 857 F.Supp. 1384. In that civil fraud case, the defendant complained that IBM and the district attorney's office "have benefitted unfairly from IBM's cooperation with law enforcement officials" in parallel criminal proceedings. (*Id.* at p. 1387.) Defendant alleged in particular that documents seized from its offices by the Los Angeles Police Department (LAPD) were viewed and photocopied by IBM and that documents it had provided to IBM were shared with the LAPD. The court first rejected the claim relating to the assistance IBM had provided the LAPD, noting that "[b]usiness frauds often involve very complex schemes" for which private investigation can be helpful. (*Id.* at p. 1389.) "Defendants, of course, point out that the sharing of information in this case went not only from plaintiff to the government, but also from the government to the plaintiff. Although they assert this fact as a particular outrage, it is no more than a red herring, at least in such a case as this, where a prosecution results. Indeed, if the prosecution proceeds before the civil trial, material information will become public. Therefore, there seems little reason to preclude the civil plaintiff from obtaining this information." (*Id.* at p. 1389, fn. 2; see also *Commonwealth v. Ellis, supra,* 708 N.E.2d at p. 654 ["It is not wrong for a prosecutor to meet with an alleged victim or its representative to discuss progress in the investigation of a crime"].)

Moreover, petitioner points to nothing in the record to suggest that Franzen's communications with the City have enabled the City to exercise control or influence over the District Attorney's investigation or prosecution. Only two of Franzen's reports were ever given to the City. Each involved areas that the City had asked him to investigate, and their purpose was to present facts to enable the District Attorney to decide whether the conduct was criminal. Both reports were submitted to the District Attorney, which then authorized Franzen to forward the reports to the City. Periodic briefing

of the victim on the status of the investigation does not compel disqualification of the prosecuting office.[8]

## D

The parties' remaining contentions can be quickly dismissed.

Petitioner challenges the incentives provided to Franzen by hourly billing as "[o]ver and above" the bias that derives from the City's paying Franzen's salary. This "lucrative financial arrangement," he argues, gave Franzen "every incentive to prolong his time" working for the District Attorney "to generate more billings." But this would be true of *any* consultant retained by the District Attorney and, indeed, would be true of any employee who is paid on an hourly basis or who is eligible for overtime pay, including police officers, deputy sheriffs, and District Attorney investigators. Petitioner cites no authority to suggest that the recusal of the duly elected district attorney depends on whether experts or other investigators are salaried or paid at an hourly rate.

Petitioner also places great emphasis on the District Attorney's zeal through these early stages of the prosecution. According to petitioner, the District Attorney "has not taken any measure that was not as harsh as possible." In petitioner's view, "such a pattern is one-hundred percent consistent with the alleged victim agent being the driving force within the [District Attorney's] office . . . ." We do not agree. "In an adversary system, [prosecutors] are necessarily permitted to be zealous in their enforcement of the law." (*Marshall v. Jerrico, Inc.* (1980) 446 U.S. 238, 248 [100 S.Ct. 1610, 1616, 64 L.Ed.2d 182].) So long as their zeal remains within legal limits—as petitioner concedes it has here—the lawful execution of their duty does not establish as a matter of law that they have surrendered their independence and impartiality. (See *Commonwealth v. Ellis, supra,* 708 N.E.2d at p. 654 ["That in the performance of their duties they have zealously pursued the defendants, as is their duty within ethical limits, does not make their involvement improper"].)

The District Attorney, on the other hand, places too great an emphasis on the strength of the People's case against petitioner in the criminal prosecution. The District Attorney contends that in the absence of a showing that the

---

[8]We are not presented here with the sharing of protected materials, such as transcripts of grand jury proceedings, and therefore express no opinion whether such information may be shared among government agencies. We likewise express no opinion on the effect, if any, that the sharing of investigative materials with a victim government entity has on the confidentiality of those materials under the Public Records Act. (See Gov. Code, §§ 6254, subd. (f), 6254.5, subd. (e).)

case is weak, any finding concerning the likelihood of unfair treatment is "merely speculative." This is a misreading of *Eubanks*, which cautioned trial courts to consider "the *entire* complex of facts surrounding the conflict to determine whether the conflict makes fair and impartial treatment of the defendant unlikely." (*Eubanks, supra*, 14 Cal.4th at p. 599, italics added.) Although a weak case may tend to corroborate the existence of a disabling conflict, it is not an essential predicate for such a finding. Especially at the early stages, it may be difficult to assess the strength or weakness of the prosecution case. Even if the case appears strong, its strength could be derivative of the very conflict about which the defendant is complaining. That a case appears strong, therefore, sheds little light on whether the asserted conflict will be disqualifying.

## III

The dissenting justice below was greatly troubled by the growing trend of private financing of criminal prosecutions and wondered whether it would culminate in a preference to seek criminal justice only for the wealthy, with the result that "[i]ndividuals of limited means, small companies, and non-profit organizations may forgo asking for [prosecution] of their claims, or simply may be turned down by the local prosecutor, because they cannot afford the costs." In *Eubanks*, we too recognized the risk that financial assistance from purported victims raised "an obvious question as to whether the wealth of the victim has an impermissible influence on the administration of justice" and whether such a system would deserve or receive the confidence of the public. (*Eubanks, supra*, 14 Cal.4th at p. 593.) At the same time, however, we noted that large corporations "often have difficulty interesting local prosecutors, whose resources are already strained by the fight against violent crime, in the investigation and prosecution of business fraud and other complicated crimes against corporate victims." (*Id.* at p. 593, fn. 5.) The provision of substantial financial assistance by crime victims thus raises important and difficult policy questions.

But balancing these weighty and seemingly conflicting concerns is beyond the scope of Penal Code section 1424, which considers neither whether the prosecutor's arrangements tend to reduce public confidence in the impartiality and integrity of the criminal justice system (see *Eubanks, supra*, 14 Cal.4th at p. 592) nor whether the benefits to society of accepting the victim's assistance outweigh the costs. The courts' role in this debate is therefore limited. In this case, we hold only that the superior court did not abuse its discretion in finding that the District Attorney need not be disqualified for accepting the assistance of a forensic accountant employed and

compensated by the City, the alleged victim. The judgment of the Court of Appeal is therefore affirmed.

George, C. J., Kennard, J., Werdegar, J., Chin, J., and Brown, J., concurred.

**MORENO, J.**—I respectfully dissent. The Court of Appeal in this case found that the prosecutor's use of a victim-funded investigator, operating for nearly three years from within the offices of the Orange County District Attorney (District Attorney), creates a conflict of interest. The majority does not revisit this conclusion, but holds that even if there is a conflict, the trial court did not abuse its discretion in finding that the conflict does not prejudice defendant. Given the substantial expenditure by the City of Orange (City) in funding the sole financial investigator in this case, as well as the critical role played by the investigator in the criminal prosecution of Jeffrey Hambarian, I find that the conflict of interest in this case is so grave as to render it unlikely that defendant will be treated fairly during all portions of the criminal proceedings. Accordingly, I find that the trial court abused its discretion in failing to recuse the District Attorney.

I.

Our analysis is governed by Penal Code section 1424. Under subdivision (a)(1), a motion for recusal of a district attorney "may not be granted unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial." (Pen. Code, § 1424, subd. (a)(1).) In *People v. Eubanks* (1996) 14 Cal.4th 580 [59 Cal.Rptr.2d 200, 927 P.2d 310] (*Eubanks*), we observed that Penal Code section 1424 involves a two-pronged analysis: (1) whether a conflict exists, and (2) whether the conflict is prejudicial to the defendant. (*Eubanks, supra,* 14 Cal.4th at p. 592.)

In the present case, the trial court applied the *Eubanks* test and determined that (1) there is no conflict in this case, and (2) even if there is a conflict, this conflict is not so grave as to render it unlikely that defendant would receive fair treatment. The Court of Appeal unanimously found that the trial court erred in determining that there is no conflict of interest, stating, "[a] conflict existed and it continues to exist." In applying the second prong of the *Eubanks* test, however, a majority of the justices below found that the trial court did not abuse its discretion in finding that even if there is a conflict, it did not prejudice defendant.

The majority below only reluctantly reached this conclusion. As the court noted, "[t]he district attorney should not take great solace in our result,

however. . . . [W]e applied the abuse of discretion standard with due deference, but we might not have reached the same result had we been sitting as trial judges." Noting that the preliminary hearing has not yet been held in this case, the court stated that "[a]t some point the amount the City has underwritten might become so large no rational jurist could say the prosecutor would not be unduly influenced. [¶] . . . [C]hanged circumstances may merit further consideration by the trial court."

I agree with the majority of this court that we should review under an abuse of discretion standard the trial court's finding that any conflict in this case is not so grave as to render it unlikely that defendant would receive fair treatment. "Our role is to determine whether there is substantial evidence to support the [trial court's] findings [citation] and, based on those findings, whether the trial court abused its discretion in denying the [recusal] motion. [Citations.]" (*People v. Breaux* (1991) 1 Cal.4th 281, 293-294 [3 Cal.Rptr.2d 81, 821 P.2d 585].) But unlike the majority, I conclude that two of the trial court's findings were not supported by substantial evidence and that the trial court abused its discretion in determining that the conflict of interest does not warrant recusal of the District Attorney.

First, the trial court found that the involvement of the City's investigator in this prosecution is proper and does not create a conflict of interest. This is wrong, as the Court of Appeal held and this court does not challenge. The involvement of the City's investigator, Jeff Franzen, does create a conflict of interest. Clearly, the trial court's mistaken conclusion that no conflict exists affected its determination that the conflict was not so grave as to warrant recusal of the District Attorney. The trial court could not accurately judge the severity of the conflict of interest when it mistakenly believed that the involvement of the City's investigator in the criminal prosecution did not create a conflict of interest at all.

The trial court's conclusion that any conflict did not warrant recusal also was based upon a second erroneous premise. The trial court determined that the District Attorney's use of the City's investigator did not create a conflict of interest because the financial arrangements insulated the District Attorney from any conflict. The trial court found significant, first, that the District Attorney had not solicited funds from the victim, and second, that the Orange Police Department, not the City, was paying the investigator's bill. This second point is factually wrong; the City is paying the bills, not the police department.

Therefore, two of the trial court's findings, that the involvement of the City's investigator does not create a conflict of interest and that the City was

not paying for the investigator's services, are not supported by substantial evidence. Without understanding that the involvement of the City's investigator in the prosecution created a conflict of interest, and without knowing that the City, not the police department, was paying the investigator's salary, the trial court could not properly determine the gravity of the conflict of interest. With this in mind, I consider whether the trial court abused its discretion in concluding that the conflict was insufficient to warrant recusal of the District Attorney.

## II.

To establish whether the prosecutor suffers from a disabling conflict of interest, "the trial court must consider the entire complex of facts surrounding the conflict to determine whether the conflict makes fair and impartial treatment of the defendant unlikely." (*Eubanks, supra*, 14 Cal.4th at p. 599.) The majority of this court analyzes each potentially prejudicial fact separately, concluding that no one fact mandates recusal. *Eubanks*, however, requires us to consider all of the facts together. The majority in *Eubanks* concluded that based on the totality of the circumstances, the trial court did not abuse its discretion in recusing the prosecutor. In his concurrence, Chief Justice George found that under the circumstances presented in *Eubanks*, recusal was mandated by law and a failure to recuse would have been an abuse of discretion. (*Eubanks, supra*, 14 Cal.4th at pp. 601-602 (conc. opn. of George, C. J.).)

In the present case, I find several individual factors, such as the substantial investment of the City in the prosecution, the crucial prosecutorial role played by the City's investigator, and the City's position as a private victim, potentially prejudicial to defendant. It is in light of the entire complex of facts in this case, however, that I conclude that fair treatment of defendant is unlikely and therefore recusal is required by law.

First, as the majority acknowledges, as of the recusal hearing, the City had paid its private financial investigator, Franzen, over $314,000 to work with the District Attorney's Office on this one case. The case is still in an early stage; it has not yet gone to a preliminary hearing. The City's financial investment in this case will only increase.[1] In *Eubanks*, we looked to the size of the victim's contributions in determining that the trial court was reasonable in recusing the district attorney. (*Eubanks, supra*, 14 Cal.4th at p. 600.) The amount of contributions in *Eubanks* was around $13,000. At the time of

---

[1] In fact, Franzen was paid an additional $140,000 for his continued investigation during the 18 months after the recusal hearing. The City has now paid Franzen over $450,000 for his services.

the recusal hearing, this case already involved an investment by the victim of over 24 times that amount. This substantial expenditure raises the serious possibility of a disabling conflict of interest.

The majority points out that in *Eubanks* the district attorney solicited the victim to pay the investigator's fees, whereas in this case the City volunteered to pay for the investigator. I do not believe this distinction makes a difference. In either case, the victim is paying for a prosecutorial expense that otherwise would have been incurred by the District Attorney's Office.[2] As in *Eubanks*, the District Attorney is aware that the victim, not the District Attorney's Office, is paying the investigator's salary. As the trial court in this case found, "[t]here is no doubt, for the record, that the District Attorney's Office has been the beneficiary of some financial assistance through these victims." Although, as the majority notes, the District Attorney does have an in-house financial investigator, this investigator is not working on Hambarian's case. If the City was not providing the investigator, the District Attorney would have to incur the costs of performing the financial analysis in the case. By accepting the services of the City's financial investigator, the District Attorney does not have to make the ordinary cost/benefit decisions of whether to pursue criminal charges against Hambarian. Further, the knowledge that for over two years the City has been paying the salary of a financial investigator to aid the prosecution, may create, on the part of the District Attorney, a sense of obligation to pursue this case.

The majority argues that the District Attorney is less likely to feel a sense of obligation to prosecute Hambarian because even if the District Attorney does not bring the case to trial, the City can use Franzen's work product in its civil action against Hambarian. In *Eubanks*, however, the fact that the victim had brought a concurrent civil suit against the defendant did not alter our conclusion that the District Attorney could suffer from a disabling conflict in accepting investigatory services paid for by the victim. (*Eubanks, supra*, 14 Cal.4th at pp. 600-601.) Additionally, the second prong of the *Eubanks* test requires us to consider fairness to the defendant at *all* stages of the criminal prosecution. As Chief Justice George noted in his concurrence in *Eubanks*, "[c]ertainly, the district attorney would have appreciated that [the victim] stood to benefit from the criminal prosecution of defendants. . . . [B]y keeping the prosecution 'alive a little longer,' [the victim] would benefit completely vis-à-vis [the defendant.] Thus, the district attorney could 'reimburse' [the victim] . . . simply by exercising discretion to continue or extend the criminal investigation for longer than it otherwise

---

[2]Contrary to the majority's assertion, I am not suggesting that recusal is required "whenever" the victim pays for a prosecutorial expense. (Maj. opn., *ante*, at p. 836.)

would." (*Eubanks, supra,* 14 Cal.4th at pp. 602-603 (conc. opn. of George, C. J.).)

Prejudice to a defendant can arise merely by maintaining an open criminal investigation. As Presiding Justice Sills pointed out in his dissent below, "[s]uch a prosecution would assist the city in its parallel civil action against Hambarian, deter the Hambarian parties from contesting civil suits against them for fear of criminal prosecution, assist the city in enforcing its monetary settlement with the Hambarian parties which depends in large part on Hambarian's conviction in the criminal proceeding, and ensure that Hambarian would be forced to sell his trash-hauling business. Such a prosecution would also compromise Hambarian's ability to simultaneously defend both the criminal and civil actions because he would be subject to a significant bail, his assets would be frozen, and relevant evidence could be gathered within the standards of criminal proceedings, an advantage over procedures applicable in civil proceedings." Just as in *Eubanks*, the District Attorney in this case is aware that maintaining an open investigation of Hambarian and filing charges against him will provide benefits to the City in its civil case against Hambarian. Even if the District Attorney were ultimately to decide not to bring this case to trial, the District Attorney might pursue its charges against Hambarian for longer than it otherwise would have, out of a sense of obligation to the City. This in itself constitutes prejudicial treatment of defendant.

A second factor contributing to a potentially disabling conflict of interest is Franzen's critical role in the criminal prosecution. Franzen is the sole financial investigator in what is a financial investigation. As the majority mentions, Franzen prepared the loss summaries in the case. These loss summaries serve two purposes. They were used as the basis for alleging sentencing enhancements in the criminal case and could be used as a measure for the restitution Hambarian might be ordered pay the City in the event of a conviction. The City has an interest in obtaining the largest possible recovery from Hambarian. It is probable that Franzen will take his employer's interests into account when performing his financial analysis of the loss. The District Attorney is relying on Franzen's reports without any review by an impartial financial analyst to verify their accuracy and fairness. Even though Franzen can be cross-examined at trial, the reliance on Franzen's loss summaries may cause pretrial unfairness to defendant, something that cannot be cured on cross-examination.[3] The District Attorney's heavy reliance on the victim-funded investigator for such a crucial aspect of the

---

[3]The 65-count information in this case included six counts of grand theft, as well as many counts of alleged money laundering (counts 38-65), filing false tax returns (counts 24-37), making false claims (counts 7-17) and charges of Corporations Code violations (counts

case raises a doubt as to whether it is possible for defendant to be fairly treated during all stages of the prosecution.

Franzen's role in the District Attorney's investigation of Hambarian is potentially prejudicial, since Franzen was serving concurrently as an employee under contract with the City, the victim in this case, and as a full-fledged member of the prosecution's team. Franzen essentially served as an agent of the District Attorney during the investigation. While in *Eubanks* the victim-funded investigators assisted the district attorney's office for a few weeks, in this case Franzen had been working from inside the District Attorney's Office for over two years at the time of the filing of the recusal motion in November 1999; he has since continued working there and billing the City for his services. Franzen has been working from his own office located inside the District Attorney's headquarters. He has used the District Attorney's resources and has written memos on District Attorney letterhead. Under the auspices of the District Attorney's Office, Franzen conducted or participated in over 55 interviews of witnesses. He often made decisions about whom to interview. In these interviews, he has been referred to by the District Attorney's Office as "[o]ur CPA." In addition, Franzen was present at the execution of most of the search warrants in the case. Due to Franzen's close connection with the District Attorney's Office during the prosecution, while at the same time under contract with and paid by the victim in the case, a likelihood of prejudice to defendant arises.

A third relevant factor in this case is the City's role as a private victim. The majority argues that the City is not a private victim like Borland, the victim in *Eubanks*, and therefore prejudice to Hambarian is less probable. While I agree that when a disinterested public entity assists in a prosecution, unfair prejudice to the defendant is less likely, the City's role in this case is neither disinterested nor exclusively public. Like Borland, the City has a direct financial interest in the criminal prosecution. The City has filed a concurrent civil suit against Hambarian, his wife, and his 15-year-old son. Additionally, the City has settled with the corporate victims in this case, acquiring their private causes of action against defendant. Therefore, the City's interest is not exclusively as a public entity; the City stands to recover the restitution owed to private victims as well.

The majority contends that defendant will not be prejudiced by the involvement of the City's investigator since the City's interest as a public

18-23). Many of these counts are subject to enhancements under Penal Code sections 186.11, subdivision (a)(1), 186.10, subdivision (c)(1)(C), (D) & (2)(B), and 12022.6, subdivision (d). *All* of these enhancements are dependant on the loss determinations made by Franzen, and no doubt contributed to the high bail of $5 million which was initially set in this case.

entity in recovering restitution from Hambarian mirrors the interest of the District Attorney. It is true that the City's recovery of funds in its civil case will benefit the public. The City's sole interest in this case is financial, however. Presumably, the City has invested over $314,000 in order to maximize its recovery from Hambarian.

The District Attorney's interest, however, goes beyond securing civil restitution for the residents of the City. As we said in *Eubanks*, " '[t]he prosecutor speaks not solely for the victim, or the police, or those who support them, but for all the People. That body of "The People" includes the defendant and his family and those who care about him.' " (*Eubanks, supra,* 14 Cal.4th at p. 589.) Fair and impartial treatment of the defendant must pervade the exercise of all of the prosecutor's discretionary functions, from the investigation and gathering of evidence, through the decisions of whom to charge and what charges to bring, to the numerous choices the prosecutor must make at trial. (*Ibid.*) As we have said, "[t]he importance, to the public as well as to individuals suspected or accused of crimes, that these discretionary functions be exercised 'with the highest degree of integrity and impartiality, and with the appearance thereof' [citation] cannot easily be overstated." (*Ibid.*) This broad interest in promoting justice cannot be equated with the City's more limited goal of obtaining civil restitution from defendant.

### III.

As we said in *Eubanks*, a disabling conflict of interest is demonstrated when the victim's financial contributions "are of a nature and magnitude likely to put the prosecutor's discretionary decisionmaking within the influence or control of an interested party." (*Eubanks, supra,* 14 Cal.4th at p. 599.) Here, the totality of the circumstances, including the amount of the contributions, the active role of the victim's investigator in the case, and the City's financial stake in the outcome of the investigation, suggests that the discretionary decisions of the prosecutor are within the influence and control of an interested party.

The fact that this "interested party" is the City should, as the majority asserts, impact our assessment of potential prejudice to defendant in this case. However, this is not a case where the City has performed an independent investigation of Hambarian and then turned its financial analysis over to the District Attorney's Office. Nor is this a case involving a joint multi-agency task force in which the City and other public entities have assigned their employees to work with the District Attorney's office to prosecute a class of individuals who had defrauded the public. The investigation of

Hambarian is not part of a broad antifraud effort, but rather is a targeted investigation in a case where the City is involved in a civil dispute and has obtained the restitution rights of private victims.

Here, the City has spent over $314,000 to hire an outside financial investigator who has the sole task of pursuing the prosecution of one defendant. The City's investigator has performed all of the financial analysis in the criminal case, using the authority and resources of the District Attorney's Office to pursue the criminal investigation. The District Attorney, in turn, has relied heavily on the services donated by the City in prosecuting this action. It has not expended any of its resources on the financial investigation in the case nor has it needed to make the decision whether such an investigation is worth the resources it consumes. The District Attorney's Office has not used an impartial financial analyst in this case, despite the fact that, as a civil litigant expecting restitution from Hambarian, the City has an interest in maximizing the losses attributed to defendant. The City stands to recover not only public funds but also funds owed to private corporations. Given the entire complex of facts in this case, it is unlikely that defendant will receive fair and impartial treatment. Therefore, I find that recusal is required as a matter of law.

I would reverse the judgment of the Court of Appeal.

Petitioner's petition for a rehearing was denied June 12, 2002, and the opinion was modified to read as printed above.